770 A.2d 130

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND,**

v.

**Dana W. JOHNSON.**

**Misc. AG No. 6, Sept. Term, 2000.**

Court of Appeals of Maryland.

April 12, 2001.

**600**

Melvin Hirshman, Bar Counsel and Raymond A. Hein, Assistant Bar Counsel for the Attorney Grievance Commission of Maryland, for petitioner.

Barry Helfand, Rockville, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

HARRELL, Judge.

Pursuant to Maryland Rule 16–709(a),[1] Bar Counsel, on behalf of the Attorney Grievance Commission (AGC) (Petitioner), and at the direction of the Review Board, filed a petition with this Court for disciplinary action against Dana W. Johnson (Respondent) and John F. McLemore.[2] In this petition, Bar Counsel prosecuted a complaint against Respondent alleging violations of Rules 1.7(b) (conflict of interest), 3.3(a)(1) (candor toward the tribunal), 5.5 (unauthorized practice of law), 7.1 (communications concerning a lawyer's services), 7.5 (firm names and letterheads), and 8.4 (misconduct) of the Maryland Rules of Professional Conduct (MRPC).[3] This Court referred the matter to Judge Ann S. Harrington of the Circuit Court for Montgomery County to conduct an evidentiary hearing and to make recommended findings of fact and conclusions of law in accordance with Maryland Rules 16–709(b)[4] and 16–711(a).[5]

---

**1.** Rule 16–709(a) states that "[c]harges against an attorney shall be filed by the Bar Counsel acting at the direction of the Review Board."

**2.** The Attorney Grievance Commission proceeded jointly against Respondent and John F. McLemore in the petition for disciplinary action. Prior to oral argument before this Court, the AGC and McLemore filed a joint petition for indefinite suspension by consent. Having granted the consent order on 17 January 2001, we will limit our discussion of McLemore to how his conduct pertains to Respondent's alleged violations of the Maryland Rules of Professional Conduct (MRPC).

**3.** At the hearing, Petitioner withdrew the charge that Respondent violated MRPC 1.8(a-b) (conflict of interest: prohibited transactions).

**4.** Rule 16–709(b) states that the "Court of Appeals by order may direct that the charges be transmitted to and heard in any court and shall designate the judge or judges to hear the charges and the clerk responsible for maintaining the record in the proceeding."

**5.** Rule 16–711(a) states that "[a] written statement of the findings of facts and conclusions of law shall be filed in the record of the proceedings and copies sent to all parties."

## I.

After a three day evidentiary hearing, Judge Harrington filed a written Opinion on 13 November 2000, in which she found, by clear and convincing evidence, that Respondent violated MRPC 1.7(b), 3.3(a)(1), 5.5(a), 7.1, 7.5(a) and (b), and 8.4(a), (c), and (d). In addition to filing exceptions to certain findings of fact and conclusions of law made by Judge Harrington, Respondent also excepted to specific evidentiary matters regarding one of the complainants, Mrs. Rebecca Bantug, and her testimony before the Inquiry Panel. Petitioner, who took exception only to Judge Harrington's conclusion that Respondent did not violate Rule 7.5(d), recommends that, even should we overrule its exception, we disbar Respondent from the practice of law for his misconduct. Assuming we do not dismiss the petition or remand the matter for a new hearing as he asks, Respondent urges, as an appropriate sanction, a reprimand or a 30 day suspension, at worst.

From the record before her, Judge Harrington made the following findings of fact pertaining to Respondent's conduct:

### A. *The Law Offices of McLemore and Johnson, P.C.*

1. Respondent was admitted to practice law in Virginia and the District of Columbia (D.C.) in June 1988. He is not and never has been licensed to practice law in Maryland.

2. In January 1997, Respondent and McLemore forged a professional association when they began sharing office space, equipment, support staff, and expenses in Silver Spring, Montgomery County, Maryland.

3. Respondent testified that he and McLemore maintained their own clients and files, with McLemore handling the Maryland cases and Respondent handling the Virginia and D.C. cases. He also claimed that, when his clients sought services in Maryland, he referred them to McLemore.

4. Respondent and McLemore practiced under the firm name of "Law Offices of McLemore and Johnson, P.C." [6]

5. Respondent admitted that he did not indicate his jurisdictional limitations on the firm's letterhead, which listed only a Maryland office. Respondent contended that he did not think he needed to list his jurisdictional limitations because he and McLemore maintained a single office in Maryland, not in multiple jurisdictions, and because they did not mix files.

## B. *The Contract of Sale for the Bantugs' Home*

1. On 13 June 1996, Respondent entered into a contract with Arturo and Rebecca Bantug for the purchase of their Fort Washington, Maryland, home. The terms of the contract required Respondent to pay $6000 [to the Bantugs] and all debts accrued and accruing, including penalties, on the first and second mortgages held by Chase Manhattan Mortgage Corporation (Chase Manhattan) and Commercial Credit Corporation, respectively, in addition to securing [re]financing by 30 May 1997, the date after which the contract would terminate. The Bantugs were required by the contract not to contact either mortgage company to discuss the sale of the property without Respondent's prior knowledge and consent.

2. Prior to [Respondent] entering into the contract for sale, Chase Manhattan retained counsel to initiate foreclosure proceedings [in Prince George's County, Maryland] based upon the Bantugs' default on their first mortgage. Respondent was aware of this situation, and on 28 May 1996, he contacted Chase Manhattan's counsel to advise that the Bantugs had retained him to represent them in connection with the pending foreclo-

---

**6.** Respondent testified that he signed Articles of Incorporation, which McLemore prepared, for the firm within one or two months of joining the firm, and that he was not aware that the papers were not filed until shortly before the Inquiry Panel proceedings in February 1999.

sure and to propose that the Bantugs make double payments on the defaulted mortgage until the arrearage was satisfied. The [lender's] law firm rejected this proposal.

3. A distant relative of the Bantugs, a practicing attorney, assisted them with drafting the contract of sale. Although the Bantugs did not retain an attorney to represent them in conjunction with this sale, Respondent did not advise them that they might want to do so.

4. On or about 16 June 1996, approximately three days after signing the contract, the Bantugs relocated to the Phillippines, where they continue to reside. Respondent moved into the Fort Washington home in June 1999.

5. Respondent breached the terms of the contract by failing to bring the first or second mortgage current.

6. On 10 July 1996, approximately one month after executing the contract of sale, Respondent again wrote to Chase Manhattan's law firm to advise that the Bantugs were still interested in bringing their account current. On 5 August 1996, Respondent sent the law firm yet another proposal for payment of the arrearage on the Bantugs' account along with a request that their loan be reinstated. Respondent attached a copy of a letter allegedly signed by Mr. and Mrs. Bantug, which explained that a family crisis had caused them to fall behind on their payments and that they desired to bring their loan current and to have their loan reinstated.

7. Rebecca Bantug testified [7] that she told Respondent of her and her husband's plans to sell their home because they were several months in arrears on both of the mortgages. According to Mrs. Bantug, Respondent of-

---

[7] Rebecca Bantug did not appear before Judge Harrington. Over Respondent's objections, *see* Part III.A, *infra,* Judge Harrington ruled that Mrs. Bantug was unavailable to testify and, therefore, received into evidence a transcript of Mrs. Bantug's prior testimony telephonically given before the Inquiry Panel on 11 February 1999.

fered to purchase the home, which she indicated Respondent knew had been appraised, prior to the sale, for $250,000. She further testified that Respondent neither disclosed that his interest in the sale might be adverse to their interest nor advised her how to deal with the delinquent mortgages.

## C. *The Bantugs' Petition for Bankruptcy*

1. Mrs. Bantug testified that she returned to the United States in June 1997, one year after her departure. Retrieving her mail from her sister's house, which she used for her forwarding address, Mrs. Bantug discovered that Chase Manhattan's counsel had attempted to contact her regarding the foreclosure sale of the Fort Washington home. Upon consulting with an attorney, Mrs. Bantug contacted Chase Manhattan and Commercial Credit to obtain information regarding the status of her mortgages; she learned then that a petition for bankruptcy had been filed on the Bantugs' behalf. On referral, Mrs. Bantug retained an attorney more familiar with foreclosure and bankruptcy proceedings to represent her and her husband in resolving the bankruptcy matter.

2. On 23 May 1997, a voluntary petition for bankruptcy was filed in the United States Bankruptcy Court, District of Maryland, Greenbelt Division. The petition bears the purported signatures of the Bantugs and was allegedly filed by McLemore, whose signature also appears on the petition. On 9 June 1997, additional documents were filed in the case, including a statement of financial affairs, an individual debtor's statement of intention, and a Chapter 13 plan, all of which bear the Bantugs' purported signatures. On 26 June 1997, a motion to convert from Chapter 13 to Chapter 7 was filed bearing McLemore's purported signature,.

3. On 27 May 1997, a notice of bankruptcy was filed [in the foreclosure action] in the Circuit Court for Prince George's County, Maryland. The notice, stating that a

voluntary petition for bankruptcy had been filed on behalf of the Bantugs, bears McLemore's purported signature.

4. The Bantugs' counsel confronted McLemore and asked him why he had filed the bankruptcy petition without the consent or knowledge of the Bantugs. McLemore responded that he did not know the Bantugs; he did not represent them; he did not file the petition; and, that he did not authorize anyone else to sign their names or his own. Rather, he informed the Bantugs' attorney that it was his partner, Respondent, who represented the Bantugs in their bankruptcy matter. Although McLemore admitted that Respondent had requested that McLemore act as local counsel in connection with a Maryland bankruptcy claim, McLemore asserted that Respondent provided him with neither the names of the parties nor the details of the case. Moreover, he claimed that he never authorized Respondent to sign his name, and that Respondent never consulted with him before he affixed the signatures and filed the petition.[8]

5. Respondent maintains that Mrs. Bantug, if not her husband, knew about the filing of the bankruptcy petition, for it was necessary to file the petition in order to stop the foreclosure sale on the Fort Washington home, which had been scheduled for 27 May 1997. Respondent also claims that he was unable to secure financing, as required under the terms of the contract of sale, because the true value of the home was significantly less than the appraisal value. He noted that he never intended to pursue the bankruptcy matter, but rather intended only to delay the foreclosure sale.

6. Respondent admitted that he signed the Bantugs' and McLemore's names to the bankruptcy petition without their express permission.[9] He reiterates, however, that

---

8. Respondent confirmed McLemore's version of events in this regard. *See* Respondent's testimony, Part III.B.2, *infra.*

9. *See* Respondent's testimony, Part III.B.1 and 2, *infra.*

Mrs. Bantug knew about the petition. It is his contention that he and Mrs. Bantug were more than friends, and that hard feelings on her part may have precipitated her complaints.

7. Mrs. Bantug testified [10] that she never retained Respondent to represent her or her husband in a bankruptcy matter, and that she never even discussed filing for bankruptcy with Respondent. Confirming Respondent's admissions, she stated that she never signed her name to any of the bankruptcy-related documents. Her account differs from Respondent's, however, in that she also claims she never authorized Respondent to sign her name.

8. Chase Manhattan's counsel ultimately sold the Fort Washington home to McLemore at a foreclosure sale on 21 January 1998. McLemore purchased the home on Respondent's behalf because Respondent could not find anyone else to attend the sale. Although McLemore intended to purchase the home in Respondent's name, pursuant to an executed power of attorney, he actually purchased the home in his own name, with the intention of immediately substituting Respondent as the purchaser. This substitution was made shortly after the sale.

Based upon these findings of fact, Judge Harrington concluded that Respondent violated MRPC 1.7(b), 3.3(a)(1), 5.5(a), 7.1, 7.5(a) and (b), and 8.4(a), (c), and (d).

Both parties except to some part or another of Judge Harrington's findings and/or conclusions. Respondent asserts that there was no conflict of interest created between the Bantugs and himself; that he did exhibit candor before the tribunal; and, that Judge Harrington and this Court have no jurisdiction over this matter. In this regard, Respondent specifically argues that, because he is not a member of the Maryland bar, he cannot be sanctioned by the Court of Appeals of Maryland. In a separate, evidentiary argument,

---

**10.** *See* note 7, *supra.*

Respondent contends that it was error for Judge Harrington to declare Mrs. Bantug an unavailable witness and to accept into evidence her testimony before the Inquiry Panel. Moreover, he argues that Mrs. Bantug's attorney should have been compelled to divulge information regarding his client's relationship with Respondent because Mrs. Bantug waived her attorney-client privilege. Petitioner excepts to Judge Harrington's conclusion that Respondent did not violate MRPC 7.5(d). We address both parties' exceptions below.

## II. *Standard of Review*

This Court has original jurisdiction over all attorney disciplinary proceedings. *See Attorney Grievance Commission v. Sheridan,* 357 Md. 1, 17, 741 A.2d 1143, 1152 (1999); *Attorney Grievance Commission v. Glenn,* 341 Md. 448, 470, 671 A.2d 463, 473 (1996); *see also* Md. Rule 16–709(b) (stating "[c]harges against an attorney shall be filed on behalf of the [Attorney Grievance] Commission in the Court of Appeals"). As to Respondent's exceptions to Judge Harrington's findings, "we [presently make] an independent, detailed review of the complete record with particular reference to the evidence relat[ed] to the disputed factual finding." *See Sheridan,* 357 Md. at 17, 741 A.2d at 1152; *Glenn,* 341 Md. at 470, 671 A.2d at 473 (quoting *Bar Association v. Marshall,* 269 Md. 510, 516, 307 A.2d 677, 680–81 (1973)). In our review, "we must keep in mind that the findings of the [hearing] judge are *prima facie* correct and will not be disturbed unless clearly erroneous." *See Sheridan,* 357 Md. at 17, 741 A.2d at 1152; *Glenn,* 341 Md. at 470, 671 A.2d at 473; *Attorney Grievance Commission v. Kemp,* 303 Md. 664, 674, 496 A.2d 672, 677 (1985); *Attorney Grievance Commission v. Collins,* 295 Md. 532, 548, 457 A.2d 1134, 1142 (1983) (quoting *Attorney Grievance Commission v. Kahn,* 290 Md. 654, 678, 431 A.2d 1336, 1349 (1981)). We note that the hearing judge "may elect to pick and choose which evidence to rely upon," *Kemp,* 303 Md. at 675, 496 A.2d at 677, for she or he is in the best position to assess a witness's credibility. *See Sheridan,* 357 Md. at 17, 741 A.2d at 1152. Therefore, we will not tamper with Judge Harrington's factual

findings if they are grounded on clear and convincing evidence. *See Kahn,* 290 Md. at 678, 431 A.2d at 1350.

We recently reiterated the definition of clear and convincing evidence in *Attorney Grievance Commission v. Mooney,* 359 Md. 56, 79, 753 A.2d 17, 35 (2000):

> The requirement of "clear and convincing" or "satisfactory" evidence does not call for "unanswerable" or "conclusive" evidence. The quality of proof, to be clear and convincing, has also been said to be somewhere between the rule in ordinary civil cases and the requirement of criminal procedure—that is, it must be more than a mere preponderance but not beyond a reasonable doubt. It has also been said that the term "clear and convincing" evidence means that the witnesses to a fact must be found to be credible, and that the facts to which they have testified are distinctly remembered and the details there of narrated exactly and in due order, so as to enable the trier of the facts to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. Whether evidence is clear and convincing requires weighing, comparing, testing, and judging its worth when considered in connection with all the facts and circumstances in evidence.

(quoting *Berkey v. Delia,* 287 Md. 302, 320, 413 A.2d 170, 178 (1980) (quoting 30 AM.JUR. 2d EVIDENCE § 1167) (citing *Whittington v. State,* 8 Md.App. 676, 679 n. 3, 262 A.2d 75, 77 n. 3 (1970))).

## III.

### A. *Respondent's Evidentiary Exceptions*

Respondent argues that Judge Harrington erred when she determined that Mrs. Bantug was an unavailable witness under Rule 5–804(a)(5) [11] and admitted into evidence, under

---

**11.** Maryland Rule 5–804, which codifies the evidentiary rules for hearsay exceptions, including when a declarant should be deemed unavailable, provides, in pertinent part:

Rule 5 804(b)(1),[12] testimony that Mrs. Bantug gave to the Inquiry Panel over the telephone on 11 February 1999. Respondent makes several assertions in pursuing this argument. First, Respondent asserts that Bar Counsel did not avail itself of all reasonable means to insure Mrs. Bantug's ability to testify before Judge Harrington, for "the burden rested upon Bar Counsel to prove that there was no process, no act, no statute, no comity, literally nothing that would produce her presence with regard to 'other reasonable means' employed to get her to trial."[13] Respondent argued further that, because "it is the cost of [his] doing business," Bar Counsel should

---

(a) *Definition of unavailability.* "Unavailability as a witness" includes situations in which the declarant:

(1) is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement;

(2) refuses to testify concerning the subject matter of the declarant's statement despite an order of the court to do so;

(3) testifies as to lack of memory of the subject matter of the declarant's statement;

(4) is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity;

(5) is absent from the hearing and the proponent of the statement has been unable to procure the declarant's attendance ... by process or other reasonable means.

A statement will not qualify under section (b) [hearsay exceptions] of this Rule if the unavailability is due to the procurement or wrongdoing of the proponent of the statement for the purpose of preventing the witness from attending or testifying.

12. Maryland Rule 5–804(b) states, in pertinent part:

(b) *Hearsay Exceptions.* The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(1) Former testimony. Testimony given as a witness in any action or proceeding or in a deposition taken in compliance with law in the course of any action or proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

13. We note that, after spending considerable time and energy researching this issue, we are unable to find any act, statute, or "comity," as the Respondent puts it, between the United States (and the State of Maryland, specifically) and the Phillippines that would enable Bar Counsel to compel a fact witness residing in the Phillippines to appear at an attorney grievance proceeding in Maryland. Contrary to Respondent's protestation, extradition is not an option.

have paid for Mrs. Bantug to fly from the Phillippines if the reason she could not attend the hearing was due to economic hardship.[14] Second, Respondent argued that Mrs. Bantug's "oral statement" should not have been admitted because "there was no oath administered in the Phillippines." Third, Respondent asserted that he was given no advance notice that Mrs. Bantug would not be present before Judge Harrington.[15] Fourth and lastly, Respondent asserted that declaring Mrs. Bantug an unavailable witness and admitting her testimony given before the Inquiry Panel "was unfair and violates [his] due process."

---

**14.** Contributing airfare from the Phillippines to Maryland, under the circumstances of this case, is not a "reasonable means" that Bar Counsel was obligated to take to induce Mrs. Bantug's appearance before Judge Harrington.

**15.** Regarding Mrs. Bantug's unavailability for the hearing before Judge Harrington, Respondent rhetorically inquired whether it was "an inconvenient date for which [Bar Counsel] could have asked for a continuance? Just asked us and we could have consented to a continuance because we want her here to testify in this case." According to Maryland Rule 2-508:

(a) Generally. On motion of any party or on its own initiative, the court may continue a trial or other proceeding as justice may require.

. . .

(c) Absent witness. A motion for a continuance on the ground that a necessary witness is absent shall be supported by an affidavit. The affidavit shall state: (1) the intention of the affiant to call the witness at the proceeding, (2) the specific facts to which the witness is expected to testify, (3) the reasons why the matter cannot be determined with justice to the party without the evidence, (4) the facts that show that reasonable diligence has been employed to obtain the attendance of the witness, and (5) the facts that lead the affiant to conclude that the attendance or testimony of the witness can be obtained within a reasonable time. The court may examine the affiant under oath as to any of the matters stated in the affidavit and as to the information or knowledge relied upon by the affiant in determining those facts to which the witness is expected to testify. If satisfied that a sufficient showing has been made, the court shall continue the proceeding unless the opposing party elects to stipulate that the absent witness would, if present, testify to the facts stated in the affidavit, in which event the court may deny the motion.

To the extent that he independently wanted Mrs. Bantug physically present at the hearing, we note that Respondent did not request expressly a continuance.

■ Maryland Rule 5–804(a)(5) requires that Bar Counsel be unable to secure Mrs. Bantug's availability at the hearing *either* by process *or other* reasonable means. The rule does not, as Respondent incorrectly contends, require that Bar Counsel go to any lengths—to exhaust every conceivable means—to procure Mrs. Bantug's attendance. As we stated in an analogous context in *State v. Breeden*, 333 Md. 212, 222, 634 A.2d 464, 468–69 (1993):

> "Other reasonable means" require efforts in good faith and due diligence to procure attendance. If the declarant is so unavailable as a witness, former testimony bearing the indicia of reliability, given as a witness at another hearing of the same or a different proceeding, may be admissible if the party against whom the testimony is now offered had an opportunity to cross-examine the witness. In such circumstances, the receipt in evidence of the prior testimony does not offend either the confrontation requirement or the hearsay rule.

In *Breeden*, we held that the State's attempts at service of process were not sufficient to meet its burden to prove that an expert witness was unavailable, thus making the admission of the expert's prior testimony a violation of the defendant's right to confrontation. 333 Md. at 227, 634 A.2d at 471. The witness in *Breeden* was located in Puerto Rico, a territory of the United States, which placed that *Breeden* witness within the scope of the court's subpoena power. 333 Md. at 222–25, 634 A.2d at 469–70.[16]

---

**16.** *Breeden* cited and discussed that, because Maryland's and Puerto Rico's uniform acts to secure witnesses effectuate the same general purpose, the State was afforded, but failed to utilize, the power to procure the attendance of the expert witness. 333 Md. at 222–25, 634 A.2d at 469–70. We note that Maryland's version of this act, Maryland Rule § 9–303(a), applies to material witnesses from another state (defined by Maryland Rule § 9–301 as "any state or territory of the United States and the District of Columbia") summoned to testify in Maryland in criminal prosecutions or grand jury investigations. We note that because of the investigatory nature of the Inquiry Panel, the proceedings at that stage of the attorney grievance process "may be likened to proceedings conducted by a grand jury in criminal cases." *Maryland State Bar Ass'n v. Frank*, 272 Md. 528, 538, 325 A.2d 718, 723 (1974).

In the present case, Mrs. Bantug is a citizen of the Phillippines.[17] Because she is a not a citizen of the United States or one of its territories, she could not be compelled, as Bar Counsel properly maintains, to attend Respondent's hearing by virtue of a Maryland judicial subpoena. "[O]ther reasonable means" requires a good faith effort on Bar Counsel's part to procure Mrs. Bantug's attendance, and, via email communications, Bar Counsel apparently made such an effort,[18] we conclude that the trial court did not err by declaring Mrs. Bantug an unavailable witness. Moreover, we also conclude that, where Respondent had and exercised a full opportunity and similar motive to cross-examine Mrs. Bantug when she testified by telephone at the Inquiry Panel hearing conducted on 11 February 1999, Judge Harrington did not err by admitting that testimony in evidence.

Additionally, we find no merit in Respondent's contention that Mrs. Bantug's testimony was inadmissible because she was not sworn properly and because the admission of her testimony violated his right to due process. The former contention becomes frivolous and transparent in light

---

**17.** The record includes copies of the pages of Mrs. Bantug's passport, which verified her status as a citizen of the Phillippines.

**18.** In an email dated 13 September 2000 from the Attorney Grievance Commission to Mrs. Bantug, Bar Counsel wrote:

As I previously informed you, the trial of the disciplinary case against John McLemore and Dana Johnson is scheduled to begin on Monday, September 18, 2000 in the Circuit Court for Montgomery County in Rockville, Maryland. The trial is scheduled to continue through Wednesday, September 20, 2000. *Based on our prior communications,* I am asking you to confirm via e-mail response that (1) you are currently a resident of the Phillippines; and (2) you will not be traveling to Maryland to testify at the trial scheduled on September 18 through 20, 2000. If this info is incorrect, please notify me if you do plan to attend the trial. Your immediate response to this inquiry is requested. (Emphasis added).

Mrs. Bantug's response, sent via email 14 September 2000, stated:

This is in response to your email dated September 13, Wednesday. This is to confirm that I am a resident of the Phillippines; also I will not be able to attend the trial on September 18 to 20, 2000 in Montgomery County, Maryland.

of the following discourse on the record before the Inquiry Panel.

> [COURT REPORTER]: May I swear in the witness?

> [MR. RYDER [19]]: Absolutely. Thank you.

> [RAYMOND HEIN]: Mrs. Bantug, I'm just, one minute, this is Raymond Hein [assistant bar counsel]. A court reporter is here in the room and he is now going to swear you in.

> [COURT REPORTER]: If you would, raise your right hand.

> [MRS. BANTUG]: Yes.

> WHEREUPON, REBECCA BANTUG, HAVING BEEN DULY SWORN ACCORDING TO LAW, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

Mrs. Bantug properly was sworn. Respondent did not raise an objection before the Inquiry Panel as to the manner or venue in which she was sworn nor how her testimony was taken. We also reiterate that Respondent, who was present at the hearing, had an opportunity and similar motive to conduct cross-examination of Mrs. Bantug at that time. Respondent exercised this opportunity fully, which undermines his argument that he was denied due process because he was unable to cross-examine Mrs. Bantug again in front of Judge Harrington. We reject, therefore, Respondent's evidentiary exceptions.[20]

---

**19.** Don F. Ryder, Jr., Esq. served as the Chairman of the Inquiry Panel that heard Mrs. Bantug's testimony.

**20.** Aggrieved by Judge Harrington's findings that Mrs. Bantug's testimony before the Inquiry Panel was credible, Respondent asserted an additional exception. The Bantugs' attorney, both before the Inquiry Panel and Judge Harrington, asserted the attorney-client privilege, on his clients' behalf, and refused to produce or discuss in detail two letters from Mrs. Bantug to him that pertained to Respondent's purchase of the Bantugs' home and to the personal nature of Respondent's relationship with Mrs. Bantug. Respondent argues that, where her attorney was "unsure" whether Mrs. Bantug had mailed one of the letters to the Inquiry Panel and thus waived the privilege, Judge Harrington should not have permitted the attorney-client privilege to be

## B. *Other Exceptions*

### 1. *Violation of MRPC 1.7(b)*

**Maryland Rule of Professional Conduct 1.7(b)**—*Conflict of*

used as both a sword and a shield. As framed by Respondent, he "asserts (*but is not certain of this position* ) that a client who asserts a claim against counsel waives any privilege by initiating this action." (Emphasis added). We disagree.

MRPC 1.6, which governs the confidentiality of information, provides:

(a) A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraph (b).

(b) A lawyer may reveal such information to the extent the lawyer reasonably believes necessary:

(1) to prevent the client from committing a criminal or fraudulent act that the lawyer believes is likely to result in death or substantial bodily harm or in substantial injury to the financial interests or property of another;

(2) to rectify the consequences of a client's criminal or fraudulent act in the furtherance of which the lawyer's services were used;

(3) to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, or to establish a defense to a criminal charge, civil claim, or disciplinary complaint against the lawyer based upon conduct in which a client was involved or to respond to allegations in any proceedings concerning the lawyer's representation of the client.

(4) to comply with these Rules, a court order or other law.

While Respondent may reveal privileged information regarding the Bantugs in defending himself against their complaint during the course of this particular proceeding, nothing in the rule permits the Bantugs' current attorney to reveal any privileged communications he received. While we agree that a letter sent to both the attorney and a third party (here, the Inquiry Panel) would no longer be privileged, we have found no evidence in the record to support Respondent's contention that such a letter was sent to or received by the Panel. Rather, we note the following discourse between Respondent and Mr. John W. Reburn, Bar Counsel's investigator:

[RESPONDENT]: Do you know there exists two communications from Mrs. Bantug to Mr. Champion [the Bantugs' current attorney], one about the personal relationship between [Respondent] and herself and the other about how they met and got into this transaction for this property?

[MR. REBURN]: I do not.

What is in this record are Mrs. Bantug's repeated refusals to waive her privilege. Because Rule 1.6 clearly prohibits the Bantugs' present attorney from revealing any confidential information without a waiver, we reject Respondent's argument.

*Interest: General Rule.*

> (b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
>
> (1) the lawyer reasonably believes the representation will not be adversely affected; and
>
> (2) the client consents after consultation.

Petitioner contends that Respondent, by indicating to Chase Manhattan's counsel that he represented the Bantugs in connection with the foreclosure while simultaneously entering into a contract of sale to purchase the Bantugs' home himself, violated MRPC 1.7(b). Specifically, Petitioner asserts that Respondent acted in his self-interest and adversely to the interest of the Bantugs, who wished to avoid a foreclosure sale, when he forced the foreclosure by breaching the terms of the contract for sale. Specifically, Petitioner argues that Respondent acted in his self-interest exclusively by living in the Bantugs' home for approximately one year and by failing to disclose to the Bantugs that he failed to obtain financing or to bring their mortgages current.

In response, Respondent asserts that he did not violate MRPC 1.7(b) because the Bantugs were represented by other counsel when they sold him their home. According to Respondent, a distant relative of the Bantugs, a practicing attorney, was involved in the preparation of the contract of sale and present at closing, where he witnessed the signing of the contract. Respondent specifically disputes the conclusion that such conduct by the Bantugs' attorney/relative does not constitute the practice of law even though there was no retainer agreement, contract, or fee involved.

After thoroughly reviewing the record, we agree with Judge Harrington's findings of fact and conclusions of law as they pertain to MRPC 1.7(b). The evidence, such as Respondent's testimony, *infra,* supports the conclusion that the Bantugs did not know about the foreclosure sale, much less

engage Respondent to represent their interests with regard to it.

[BAR COUNSEL]: Mr. Johnson, at any time prior to filing the voluntary petition for bankruptcy in the names of Arturo and Rebecca Bantug, did you have authorization, written or oral specifically from Arturo Bantug to file a bankruptcy case in his name?

[RESPONDENT]: Yes, I did.

\* \* \*

[BAR COUNSEL]: Do you have any written agreements to represent Mr. Bantug?

[RESPONDENT]: Yes, I do.

[BAR COUNSEL]: Do you have that here with you today?

[RESPONDENT]: You have it. It's the contract for purchase of realty.

\* \* \*

[BAR COUNSEL]: Can you tell us where in that document it authorizes you to file bankruptcy on behalf of Mr. Bantug?

[RESPONDENT]: The last whereas clause on the first page. Whereas, until such time as buyer acquires financing, sellers will take all lawful and necessary steps to protect sellers' and buyers' interest in the premises.

[BAR COUNSEL]: And you believe that authorized you to file for bankruptcy on behalf of Mr. Bantug?

[RESPONDENT]: That in addition to oral statements.

\* \* \*

[BAR COUNSEL]: Was the term 'bankruptcy' ever discussed with Mr. Bantug?

[RESPONDENT]: Yes, we discussed bankruptcy, as one of many options.

[BAR COUNSEL]: In May of 1997, when a bankruptcy was actually filed in the United States Bankruptcy Court, did you speak to Mr. Bantug before filing that?

[RESPONDENT]: No, I didn't. I hadn't spoken to Mr. Bantug since June 13th, 1996.

\* \* \*

[BAR COUNSEL]: Did you send a copy of the bankruptcy to Mrs. Bantug?

[RESPONDENT]: No, I didn't send one to her. . . . I didn't forward it because I'm not really sure where she was. . . .

We find it incredible that Respondent is unable to recognize the conflict of interest that he explains so clearly. Moreover, we share Judge Harrington's obvious difficulty accepting that Respondent truly believed that the language quoted *supra* from the contract of sale authorized Respondent to file for bankruptcy on the Bantugs' behalf. Assuming *arguendo* that such language and the purported "oral statements" [21] provided him with the authority, then, using Respondent's reasoning, Respondent ("buyer") would be authorized to file a bankruptcy petition on the Bantugs' ("sellers") behalf so that the Bantugs could protect Respondent's and their own interests in the property. Common sense and well-recognized legal principles indicate this cannot be so.

■■■ Assuming, *arguendo*, that the Bantugs were represented by independent counsel in negotiating and executing the contract of sale, Respondent nonetheless acted in his own interest, and against the interest of the Bantugs, when he failed to record the deed transferring title to the property, submitted to Chase Manhattan a proposal on the Bantugs' behalf (but without their knowledge or consent) for a workout of the arrearages of a loan that *Respondent* was obligated to bring current under the terms of the contract of sale, initiated the bankruptcy proceeding without the Bantugs' knowledge, and failed to take any remedial action to have the unautho-

---

21. We note that, "as a matter of substantive law, parole evidence ordinarily is inadmissible to vary, alter or contradict a contract, including a release, that is complete and unambiguous, in the absence of 'fraud, accident or mutual mistake.' " *Bernstein v. Kapneck*, 290 Md. 452, 460, 430 A.2d 602, 606 (quoting *McLain v. Pernell*, 255 Md. 569, 572, 258 A.2d 416, 418 (1969)).

rized bankruptcy case dismissed. We conclude, therefore, that Judge Harrington's findings of fact and conclusions of law that Respondent violated MRPC 1.7(b) were based on clear and convincing evidence.

## 2. *Violation of MRPC 3.3(a)(1)*

**Maryland Rule of Professional Conduct 3.3(a)(1)—***Candor toward the tribunal.*

(a) A lawyer shall not knowingly:

(1) make a false statement of material fact or law to a tribunal. . . .

■ Respondent excepts to Judge Harrington's findings that he forged the Bantugs' and McLemore's signatures. According to Respondent, both the Bantugs and McLemore knew that Respondent was going to sign their names to the bankruptcy petition.[22] Yet, we note the following discourse before Judge Harrington between Bar Counsel and Respondent regarding whether McLemore authorized the filing of the bankruptcy petition and whether Respondent filed accurate information in that petition.

> [BAR COUNSEL]: Mr. McLemore didn't know anything about [the filing of the bankruptcy petition or the foreclosure on the Batungs' home]?

> [RESPONDENT]: No, he didn't.

> [BAR COUNSEL]: And to the extent that you may have had conversations with the Bantugs after your association with Mr. McLemore, he wouldn't have known about that [the bankruptcy petition] even after your association?

> [RESPONDENT]: No, because all of my discussions were with [Mrs. Bantug] at that time.

* * *

---

22. Compare Respondent's testimony regarding whether the Bantugs knew of and consented to the filing of the bankruptcy petition, *supra,* Part III.B.1.

[BAR COUNSEL]: Well, there came a point when you actually had to prepare some paperwork to file [for the bankruptcy petition].

[RESPONDENT]: Yes, I prepared them and I filed them and I didn't show them to him.

[BAR COUNSEL]: You at no point showed them to him.

[RESPONDENT]: No. I think the first time he saw them was when [the Bantugs' attorney] showed them to him.

\* \* \*

[BAR COUNSEL]: You never said "Hey [McLemore], remember today I'm going down to the Bankruptcy Court to file [the Bantugs' bankruptcy petition], and remember I talked to you about that matter, and I am going to do it today"?

[RESPONDENT]: No, I didn't do that.

Regardless of whether McLemore agreed generally, at an earlier and undetermined date, to act as Maryland counsel for Respondent or his clients, according to Respondent's own testimony, *supra*, McLemore did not authorize Respondent to sign McLemore's name on the bankruptcy petition. McLemore's testimony, *infra*, supports this finding:

"I've never met with the Bantugs. I've never had a retainer agreement with them. I never had any kind of agreement with them.

I never signed any bankruptcy petitions. I don't have any explanations of why particular petitions were signed and my name was on them, other that I didn't give authorization for them."

Additionally, Respondent admitted to Judge Harrington that "he filed a bankruptcy petition with inaccurate and incomplete information." The testimony of Mr. Reburn corroborates this finding:

[BAR COUNSEL]: Did [Respondent] give you any further information about the bankruptcy filing?

[MR. REBURN]: Well, I inquired about whether or not he had been retained, and the preparation of the documents;

and he acknowledged that he had not been paid. I had documents in front of me and we reviewed them; I reviewed those with him, but he had not been paid the fee that was outlined on the bankruptcy documents and *he had not been retained,* and there were misrepresentations. [Emphasis added].

* * *

[MR. REBURN]: ... I said "Is that a misrepresentation?" And he indicated to me that it was. And one of them [the misrepresentations] was the fee amount.... [H]e said he sat at his computer and inputted the information, and he made up the information that was put on the form without the benefits of [an agreement with the Bantugs].

[BAR COUNSEL]: You indicated one of the things was fee amount. Were there other specific items that [Respondent] acknowledged to be misrepresentations?

[MR. REBURN]: Well, the address for the Bantugs; they were in the Philippines. And that he lived in the house, and he has them listed as 7504 Burgess Lane.[23] The fact that the document titled, Notice to Individual Consumer Debtor, the last line says "I, the Debtor, affirm that I have read this notice" and they [the Bantugs] had not.

[MR. REBURN]: ... Then there's the statement regarding compensation that bears the signature 'John McLemore'; that is misrepresentation.

[BAR COUNSEL]: Did you ask [Respondent] whether he had knowledge of any of the Bantugs' other finances?

---

**23.** Although Respondent acknowledged that the Bantugs did not live at the Fort Washington address, he provided that address as the "Street Address of Debtor" on the voluntary petition for bankruptcy that he filed in the Bantugs's names with the Bankruptcy Court of the United States District Court, District of Maryland, Greenbelt Division. We note the following exchange between Bar Counsel and Respondent:
[BAR COUNSEL]: Did Arturo and Rebecca Bantug reside at 7504 Burgess Lane in May of 1997?
[RESPONDENT]: Well, they didn't physically live there, no.....

[MR. REBURN]: No. He sat at the computer, he told me, and inputted the information. *He made up information without input from [the Bantugs].* [Emphasis added]. Clearly, Respondent failed to exhibit candor either to the federal bankruptcy court or to the Circuit Court for Prince George's County when he filed the bankruptcy petition and the notice of bankruptcy in the foreclosure action, respectively.

Judge Harrington's role as the fact finder placed her in the best position to assess witness credibility and "to pick and choose which evidence to rely upon." *Kemp,* 303 Md. at 675, 496 A.2d at 677; *see Sheridan,* 357 Md. at 17, 741 A.2d at 1152. Having weighed the evidence and the testimony before her, Judge Harrington found that Respondent did not discuss the bankruptcy proceeding with the Bantugs, and thus he did not have the authority to sign their names to the petition. Judge Harrington also found that Respondent completed the bankruptcy petition using what he knew to be incorrect information about the Bantugs, and that he did not have McLemore's authorization to enter his signature on that petition. Because these findings are based upon clear and convincing evidence, we sustain the resultant conclusion that Respondent violated MRPC 3.3(a)(1).

### 3. *Violation of MRPC 5.5(a)*

**Maryland Rule of Professional Conduct 5.5(a)**—*Unauthorized practice of law.*

A lawyer shall not:

(a) practice law in a jurisdiction where doing so violates the regulation of the legal profession in that jurisdiction. . . .

 Maintaining that he is not a member of the Maryland Bar and has never practiced law in Maryland state courts, Respondent asserts that Judge Harrington erred when she concluded that he violated MRPC 5.5(a).[24] Rather, he asserts

---

24. Respondent expands this argument by asserting that Judge Harrington and this Court have no jurisdiction over him since he is not, as he

that he "only possessed an office in Maryland." Respondent argues that this case is solely within federal jurisdiction because he filed pleadings and papers in a federal bankruptcy matter only. He further contends that his filing of the notice of bankruptcy in the Prince George's County foreclosure case was "not the act of an attorney and had no legal significance. It was simply courtesy to all; a notice that the bankruptcy had been filed."

Respondent's jurisdictional arguments are unfounded, for Respondent did practice law in Maryland without a license. Judge Harrington found that Respondent "met with clients in a Maryland office and advised clients in that office." She also found that Respondent misled the public, as well as his clients, by not including his jurisdictional limitations on the firm's letterhead, which bore only a Maryland address. The following interaction between Respondent and Bar Counsel is evidence supporting the judge's findings:

[RESPONDENT]: Well, let me just address the issue of the letterhead. As I understand the Rules of Maryland ... I'm not identified on the letterhead, there's a McLemore & Johnson. As I understand the term identified, my name would have to be on the letterhead, and if my name was on the letterhead, then I would have to put the jurisdictions where I'm admitted to practice law.

[BAR COUNSEL]: Well, who's Johnson?

[RESPONDENT]: I'm Johnson, but again. . . .

[BAR COUNSEL]: Isn't that on the letterhead?

[RESPONDENT]: No, I am not on the letterhead. What's the Johnson? My name is Dana W. Johnson. I'm not Johnson. . . .

---

contends, a member of the Maryland Bar. According to Respondent, he should not be subject to the jurisdiction of this Court but, if at all, to the jurisdiction of "the Federal Courts who it is believed have their own separate disciplinary procedures." We disagree for the reasons enunciated *infra*.

[BAR COUNSEL]: Well, who's Johnson? Suppose I called up your office, and ... I said I wanted to speak to Mr. Johnson, who am I going to speak to?

[RESPONDENT]: They're going to speak to me, but the law, and you can say it's a loophole or a technicality, but the law says in my opinion it speaks for itself. . . .

\* \* \*

[BAR COUNSEL]: Well, where do you practice? Do you practice out of the Silver Spring office for D.C. and Virginia?

[RESPONDENT]: Well, understanding what it means to practice, my office is in Silver Spring, Maryland. I'm admitted in D.C. and Virginia. . . . [25]

[BAR COUNSEL]: Where do you keep your files?

[RESPONDENT]: Oh, my files I keep some at home in Maryland, I keep some at my office.

[BAR COUNSEL]: Where do you live in Maryland?

[RESPONDENT]: I live in Fort Washington.

---

**25.** We note that neither party addressed whether Petitioner was a member of the federal bar. We note this because United States Bankruptcy Court for the District of Maryland Local Rule 9010-3, which governs who may appear as counsel, provides, in pertinent part:

(a) Generally. Except as otherwise provided in this Rule only members of the Bar of the District Court may appear as counsel.

(b) Admission *Pro Hac Vice.*

(1) The court can permit any attorney (except a member of the Maryland Bar) who is a member in good standing of the Bar of any other United States Court or of the highest court of any state to appear and participate as counsel in a particular bankruptcy case. Such permission will not constitute formal admission to the Bar of the District Court. An attorney admitted *pro hac vice* is subject to the disciplinary jurisdiction of the District Court and of this court.

(2) A party represented by an attorney who has been admitted *pro hac vice* must also be represented by an attorney who is a member of the Bar of the District Court.

We note that Local Rule 9010-3(b) does not apply to Respondent because he acknowledged that he did not enter his appearance *pro hac vice* and that the Bantugs were not represented by McLemore. As the record does not reflect whether Respondent is a member of the federal District Court bar, the reference in his brief to the "separate method of handling disciplinary matters in the Federal Courts" may present an illusory alternative.

[BAR COUNSEL]: ... Do you have an office in your home?

[RESPONDENT]: No, I don't have an office per se in my home, but practicing law sometimes you're just a voice over the phone, so I make phone calls from home.

\* \* \*

[BAR COUNSEL]: Have you ever signed any retainer forms with anybody in the State of Maryland representing yourself as an attorney in the State of Maryland?

[RESPONDENT]: Sure, yeah, retainers have been executed between myself and people that I've represented, and we've executed those retainers in the State of Maryland, yes.

\* \* \*

[BAR COUNSEL]: Well, do you ever meet with clients who come in and have a case that would properly be in Maryland?

[RESPONDENT]: Yeah, I have, and actually I did this week, and, no, I did not tell her that I was not admitted in Maryland, but I told her—actually, I think I did because I told her my, I might have phrased it this way, I told her I don't handle Maryland matters. My partner would have to do it. So if that implicitly states that I'm not admitted in Maryland, but to respond to your question, I don't say I'm not admitted in Maryland.

[BAR COUNSEL]: You send out correspondence do you not on McLemore & Johnson, P.C. stationery, correct?

[RESPONDENT]: Routinely.

[BAR COUNSEL]: And when you send out that correspondence and sign your name, do you give any indication that you're not admitted to the Maryland Bar.

[RESPONDENT]: No I don't.

 "[T]he determination of what constitutes the practice of law is ultimately one that this Court makes." *Attorney Grievance Commission v. Bridges,* 360 Md. 489, 505, 759 A.2d 233, 242 (2000) (citing *Public Service Commission v. Hahn*

*Transp., Inc.,* 253 Md. 571, 583, 253 A.2d 845, 852 (1969); *Lukas v. Bar Association of Montgomery County, Inc.,* 35 Md.App. 442, 447, 371 A.2d 669, 672 (1977)). We refer Respondent to MRPC 8.5, which governs our disciplinary jurisdiction over attorneys engaged in the practice of law in this State and which provides, in pertinent part:

(b) A lawyer not admitted by the Court of Appeals to practice in this State is subject to the disciplinary authority of this State for conduct that constitutes a violation of these Rules and that:

(1) involves the practice of law in this State by that lawyer, or

(2) involves that lawyer holding himself or herself out as practicing law in this State, . . . .

Moreover, Maryland Rule 16–701(a) states:

Attorney means any person admitted by the Court of Appeals to practice law. *For purposes of discipline* or inactive status, *the term also includes a member of the bar of any other state, district, or territory of the United States who engages in the practice of law in this State,* or holds himself or herself out as practicing law in this State, or who has the obligation of supervision or control over another attorney who engages in the practice of law in this State.

(Emphasis added). Considering that Respondent testified that he maintained an office in Maryland where he met clients, made phone calls to clients from his Maryland home, executed retainer agreements in Maryland, and "routinely" sent out correspondence on letterhead that indicated a Maryland office but did not indicate Respondent's jurisdictional limitations, Respondent placed himself within the proper reach of our disciplinary investigatory authority under MRPC 8.5(b). *See Bridges,* 360 Md. at 506, 759 A.2d at 242 (citing *Attorney Grievance Commission v. Hallmon,* 343 Md. 390, 681 A.2d 510 (1996)). Because there is clear and convincing evidence on the record supporting these findings, we agree with Judge Harrington's conclusion of law that Respondent violated MRPC 5.5(a).

### 4. *Violation of MRPC 7.1 and 7.5(a) and (b)*

**Maryland Rule of Professional Conduct 7.5**—*Firm names and letterheads.*

(a) A lawyer shall not use a firm name, letterhead or other professional designation that violates Rule 7.1. A trade name may be used by a lawyer in private practice if it does not imply a connection with a government agency or with a public or charitable legal services organization and is not otherwise in violation of Rule 7.1

(b) A law firm with offices in more than one jurisdiction may use the same name in each jurisdiction, but identification of the lawyers in another office of the firm shall indicate the jurisdictional limitations on those not licensed to practice in the jurisdiction where the office is located.

**Maryland Rule of Professional Conduct 7.1**—*Communications concerning a lawyer's services.*

A lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services. A communication is false or misleading if it:

(a) contains a material misrepresentation of fact or law, or omits a fact necessary to make the statement considered as a whole not materially misleading;

(2) is likely to create an unjustified expectation about results the lawyer can achieve, or states or implies that the lawyer can achieve results by means that violate the rules of professional conduct or other law; or

(c) compares the lawyer's services with other lawyers' services, unless the comparison can be factually substantiated.

▮▮ Before Judge Harrington, Respondent addressed Bar Counsel's queries regarding his firm's letterhead and the correspondence bearing it which he mailed. *See* Respondent's testimony, Part III.B.3, *supra*. In his brief, however, he did not raise the issue of whether Judge Harrington erred when she found that he violated MRPC 7.1 and 7.5(a) and (b) when he did not provide his jurisdictional limitations on his firm's

letterhead. Considering the testimony provided in Part III. B.3, *supra*, we conclude that Judge Harrington had before her clear and convincing evidence that Respondent violated subsections of MRPC 7.1 and 7.5(a) and (b).

 Petitioner excepts to Judge Harrington's conclusion that Respondent did not violate MRPC 7.5(d), which states "[l]awyers may state or imply that they practice in a partnership or other organization only when that is the fact." Petitioner argues that Respondent and McLemore practiced law ostensibly as a professional corporation under the name of "McLemore & Johnson, P.C." for two years before they filed an Articles of Incorporation with the State. The hearing judge found, however, that while Respondent and McLemore "acted carelessly in creating their letterhead and establishing their professional corporation, ... their use of the initials 'P.C.' was not a deliberate attempt to avoid liability. Further [Johnson and McLemore] cured the defect when they filed the Articles of Incorporation with the State and paid any taxes due." Although we agree that Respondent's conduct was careless and irresponsible, we deny Petitioner's exception and conclude that there was clear and convincing evidence upon which Judge Harrington found that Respondent did not violate MRPC 7.5(d).

### 5. *Violation of MRPC 8.4(a), (c) and (d)*

**Maryland Rule of Professional Conduct 8.4—***Misconduct.*

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through acts of another;

. . . .

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice; . . . .

Respondent's exceptions to Judge Harrington's conclusion that he violated MRPC 8.4(a), (c), and (d) are merely a reiteration of the exceptions he asserted *supra*. Having already sustained Judge Harrington's conclusions that Respondent violated MRPC 1.7(b), 3.3(a)(1), 5.5(a), 7.1, and 7.5(a) and (b), we conclude that Judge Harrington was presented with clear and convincing evidence from which to determine that Respondent violated MRPC 8.4(a), (c), and (d).[26]

## IV.

 In determining the proper sanction for Respondent's misconduct, we note that it is well settled that

"[t]he purpose of disciplinary proceedings against an attorney is to protect the public rather than to punish the erring attorney." *Attorney Grievance Commission v. Hamby*, 322 Md. 606, 611, 589 A.2d 53, 56 (1991))). "The public is protected when sanctions are imposed that are commensurate with the nature and gravity of the violations and the intent with which they were committed." *Attorney Grievance Commission v. Awuah*, 346 Md. 420, 435, 697 A.2d 446, 454 (1997). The severity of the sanction depends upon the facts and circumstances of the case before this Court. *Hamby*, 322 Md. at 611, 589 A.2d at 56. Imposing a sanction protects the public interest "because it demonstrates to members of the legal profession the type of conduct which will not be tolerated." *Id.*

*See Attorney Grievance Commission v. Mooney*, 359 Md. at 96, 753 A.2d at 38; *Attorney Grievance Commission v. Brown*, 353 Md. 271, 295, 725 A.2d 1069, 1080 (1999) (quoting *Attorney*

---

**26.** We highlight a particular comment made by Respondent in his exceptions. Respondent asserted that, with the Bantugs' approval, "he never intended to pursue the bankruptcy [in federal bankruptcy court] and even the Notice of Bankruptcy filed in Prince George's County." Although neither Bar Counsel nor Judge Harrington questioned whether MRPC 3.1, which governs meritorious claims and contentions, had been violated, Respondent also walked the fine line of frivolity when he filed a bankruptcy petition, laden with supposititious information, that he had no intention of pursuing.

*Grievance Commission v. Ober,* 350 Md. 616, 631, 714 A.2d 856, 864 (1998)).

Bar Counsel recommends that Respondent be disbarred from the practice of law for the misconduct presented in this case. Respondent counters that such disciplinary action is not warranted where Respondent is "a young lawyer" and where "[i]f there was a loss it was minimal." Respondent calls to our attention *Attorney Grievance Commission v. O'Neill,* 285 Md. 52, 53, 400 A.2d 415, 416 (1979), where a young attorney who had been admitted to the bar only eight months made, during the course of one day, false statements to a Howard County Circuit Court judge, an Assistant State's Attorney for Howard County, and an agent of the Division of Parole and Probation assigned to Howard County. In *O'Neill,* the respondent informed the judge of his deceit the same day he uttered the falsehoods and wrote to Bar Counsel to state that

> I have objectively searched my heart asking the questions, "Am I fit to be a Member of the Bar of the State of Maryland? Regardless of the outcome of this, Should I voluntarily resign my membership in the Bar in the best interest of the Bar?" After many weeks of soul searching, I came to the conclusion that I am both morally and intellectually fit to be a Member of the Bar.

*O'Neill,* 285 Md. at 56, 400 A.2d at 417–18. Finding respondent's words and conduct relevant to determining the proper sanction to impose, the Court ultimately ordered a public reprimand. *O'Neill,* 285 Md. at 57, 400 A.2d at 418.

We are at a loss as to why Respondent apparently believes the *O'Neill* case is analogous to his own. Unlike the young attorney in *O'Neill,* who recognized his wrongdoing and considered what effect his conduct could have on the profession, Respondent neither recognizes that his conduct violated the MRPC nor expresses any regret for the harm he caused. Rather, Judge Harrington found that Respondent's actions were "without excuse or mitigation." In light of Respondent's repetitive instances of unauthorized practice of law and acts of

deceit, represented in the findings of fact, we agree completely with Judge Harrington's assessment.

In *Attorney Grievance Commission v. Harper & Kemp*, 356 Md. 53, 737 A.2d 557 (1999), we determined that an attorney not licensed to practice law in Maryland violated MRPC 5.5(a) in a "deliberate and persistent" manner when he "set up office for the general practice of law in Baltimore City in order to wring whatever value he could out of the inventory of pending cases of a disbarred lawyer who had practiced in Baltimore City." *Harper & Kemp*, 356 Md. at 70, 737 A.2d at 566. Determining that there was "no reasonable basis on which [the attorney] could have thought his conduct was lawful," we ordered the attorney be disbarred because "[o]ther unadmitted attorneys must be deterred from attempting to practice law in violation of the statutory prohibition against unauthorized practice." *Id.* The same sanction is appropriate here, where Respondent misled the public regarding his jurisdictional practice limitations and forged the signatures of McLemore and the Bantugs without their consent.

Bar Counsel argues that the appropriate sanction for Respondent is disbarment in light of the serious nature of his conduct. We agree. Respondent repeatedly engaged in conduct involving dishonesty, fraud, deceit, and misrepresentation. He made false statements to a tribunal, and he acted against the interests of the Bantugs during and after the sale of their home to him. We conclude that the appropriate sanction in this case is disbarment.[27]

---

27. Maryland Rule 16–713(b) states, in pertinent part:

b. *Attorney not admitted by Court of Appeals.* 1. Duty of Clerk. With regard to an attorney not admitted by the Court of Appeals to practice law, upon entry of an order disbarring ... the attorney in this State, the Clerk of the Court of Appeals forthwith shall place the name of the attorney on a list maintained in that Court of non-admitted attorneys who are excluded from exercising in any manner the privilege of practicing law in this State.

2. Effect. The attorney may not practice law in this State and is disqualified from admission to practice law in this State after entry of an order disbarring the attorney. . . .

**634**

IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT; INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–715(c), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST DANA W. JOHNSON; RESPONDENT'S DISBARMENT SHALL COMMENCE THIRTY DAYS FROM THE FILING OF THIS OPINION.