*Attorney Grievance Commission v. Tawana D. Shephard*, Misc. Docket AG No. 22, September Term 2014, Opinion by Greene, J.

ATTORNEY DISCIPLINE – SANCTIONS – DISBARMENT – Respondent, Tawana D. Shephard, violated Maryland Lawyers' Rules of Professional Conduct 1.1, 1.2(a), 1.3, 1.4(a)(2), 1.5(a), 1.15(a), (c), and (d), 5.3, 5.5, and 8.4(d). Respondent also violated Maryland Rule 16-606.1. These violations stemmed from Respondent's engagement in the unauthorized practice of law as well as her role as "Managing Attorney" with sole signatory authority over attorney trust accounts at the Glenmore Law Firm. At the time of these violations, which occurred in Maryland, Respondent was not a member of the Maryland Bar; Respondent was admitted to the Bar of the United States District Court for the District of Maryland as well as the Bars of the State of Virginia, the District of Columbia, and the federal Bars of those jurisdictions. Under the circumstances, the appropriate sanction is disbarment.

Circuit Court for Baltimore City
Case No. 24-C-14-003643
Argued: May 6, 2015

IN THE COURT OF APPEALS
OF MARYLAND

Misc. Docket AG No. 22

September Term, 2014

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

v.

TAWANA D. SHEPHARD

_____

Barbera, C.J.
*Harrell
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.

_____

Opinion by Greene, J.
McDonald, J., dissents.

_____

Filed: August 6, 2015

*Harrell, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

This attorney disciplinary proceeding involves a lawyer, unlicensed to practice law in the state of Maryland, assuming the role of "Managing Attorney" in a Maryland law firm and meeting with clients in the firm's Maryland office. On June 5, 2014, the Attorney Grievance Commission of Maryland ("Petitioner" or "Bar Counsel"), filed in this Court a "Petition for Disciplinary or Remedial Action" pursuant to Maryland Rule 16-751(a) against Tawana D. Shephard ("Respondent"). The Petition, as amended,[1] alleges that Respondent violated numerous Maryland Lawyers' Rules of Professional Conduct ("MLRPC" or "Rule"), specifically Rules 1.1 (Competence),[2] 1.2(a) (Scope of Representation and Allocation of Authority Between Client and Lawyer),[3] 1.3 (Diligence),[4] 1.4 (Communication),[5] 1.5 (Fees),[6] 1.15(a), (c), and (d) (Safekeeping

---

[1] Petitioner dropped some allegations and charges against Respondent during the course of the instant proceedings.

[2] MLRPC 1.1 states that "[a] lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."

[3] MLRPC 1.2(a) provides in pertinent part that "a lawyer shall abide by a client's decisions concerning the objectives of the representation and, when appropriate, shall consult with the client as to the means by which they are to be pursued. . . ."

[4] MLRPC 1.3 provides that "[a] lawyer shall act with reasonable diligence and promptness in representing a client."

[5] MLRPC 1.4 provides in relevant part that "(a) [a] lawyer shall . . . (2) keep the client reasonably informed about the status of the matter."

[6] MLRPC 1.5 states in pertinent part that "[a] lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses. . . ."

Property),[7] 5.1 (Responsibilities of Partners, Managers, and Supervisory Lawyers),[8] 5.3

(Responsibilities Regarding Nonlawyer Assistants),[9] 5.5 (Unauthorized Practice of

---

[7] MLRPC 1.15(a), (c), and (d) provide:

"(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules, and records shall be created and maintained in accordance with the Rules in that Chapter. . . .

(c) Unless the client gives informed consent, confirmed in writing, to a different arrangement, a lawyer shall deposit legal fees and expenses that have been paid in advance into a client trust account and may withdraw those funds for the lawyer's own benefit only as fees are earned or expenses incurred.

(d) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall deliver promptly to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall render promptly a full accounting regarding such property.

[8] MLRPC 5.1 provides, in pertinent part, that "(a) [a] partner in a law firm, and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm, shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that all lawyers in the firm conform to the [MLRPC]. . . . ."

[9] MLRPC 5.3 provides that "[w]ith respect to a nonlawyer employed or retained by or associated with a lawyer:

(a) a partner, and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer;

(b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer;

(c) a lawyer shall be responsible for conduct of such a person that would be a violation of the [MLRPC] if engaged in by a lawyer if:

(1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or

(continued...)

2

Law),[10] and 8.4(d) (Misconduct).[11]  Petitioner also charged Respondent with violations of Maryland Rule 16-606.1 (Attorney Trust Account Record-Keeping)[12] and § 10-306 (Misuse of Trust Money) of the Maryland Code (1989, 2010 Repl. Vol., 2014 Supp.), Business Occupations and Professions Article ("BOP").[13]

By order dated June 10, 2014, this Court referred the matter to Judge Pamela J. White of the Circuit Court for Baltimore City to conduct an evidentiary hearing and to render findings of fact and conclusions of law, in accordance with Maryland Rule 16-757.

----

(...continued)
> (2) the lawyer is a partner or has comparable managerial authority in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action. . . ."

[10] MLRPC 5.5 provides in pertinent part:
(a) A lawyer shall not practice law in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction, or assist another in doing so.
(b) A lawyer who is not admitted to practice law in this jurisdiction shall not:
(1) except as authorized by these Rules or other law, establish an office or other systematic and continuous presence in this jurisdiction for the practice of law; or
(2) hold out to the public or otherwise represent that the lawyer is admitted to practice law in this jurisdiction.

[11] MLRPC 8.4(d) provides that "[i]t is professional misconduct for a lawyer to . . . (d) engage in conduct that is prejudicial to the administration of justice."

[12] Rule 16-606.1 provides in pertinent part that a lawyer shall create and maintain records "for the receipt and disbursement of funds of clients or of third persons[,]" as well as "[a] record for each client matter in which the attorney receives funds in trust" and "[a] record that identifies the funds of the attorney held in each attorney trust account as permitted by Rule 16-607(b). . . ."

[13] BOP § 10-306 provides that "[a] lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer."

3

Judge White conducted a two day hearing on December 1-2, 2014, during which she heard testimony from the Respondent as well as the following client witnesses: Edna Kaileigh-Bailey, Helene Cunningham, Katrina Smith, Joyce Whitaker, and Debra Lampton. On January 20, 2015, Judge White issued her written findings of fact and conclusions of law in which she found, by clear and convincing evidence, that Respondent violated MLRPC 1.1, 1.2(a), 1.3, 1.4(a), 1.5(a), 1.15(a), (c), and (d), 5.3, 5.5, and 8.4(d), as well as Maryland Rule 16-606.1. We summarize Judge White's findings as follows.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Respondent was admitted to the Virginia Bar in 1993 and to the District of Columbia Bar in 2006. She is also a member of the Bars of the federal courts in those jurisdictions. She is not a member of the Maryland Bar, but was admitted to the Bar of the United States District Court for the District of Maryland sometime in 2011. Her application to the Maryland Bar is pending.

In June of 2010, Respondent was asked by her then-employer, Newton Gaynor, a non-lawyer, to join a new firm he was creating with an attorney, J.R. Howell. The firm was established as the Glenmore Law Firm, LLC ("Glenmore"), located in Beltsville, Maryland. Services offered by Glenmore included mortgage loan modification negotiations, forensic audits, litigation against lenders, and bankruptcy. Glenmore hired Respondent as an independent contractor, and Respondent signed a "Memorandum of Understanding" dated July 9, 2010, detailing the terms of her employment with the firm.

4

On the firm letterhead, Respondent was identified as a member of the Virginia and District of Columbia Bars. At the time she was hired, Respondent expected to provide primarily or exclusively bankruptcy services. According to the hearing judge, Respondent "understood that her duties ordinarily included trying to resolve client complaints, making suggestions to Mr. Gaynor for attorneys' assignment to cases, and meeting with bankruptcy clients or describing other firm services to be offered to clients." Respondent understood that other attorneys were contracted to represent clients in foreclosure defense actions, and additional contract attorneys were hired to address mortgage loan modifications. Mr. Gaynor, sometimes in consultation with Respondent, met with and hired several lawyers, none of whom stayed longer than a few months at the firm.

Soon after joining the firm in July 2010, and after the departure of Mr. Howell, Respondent was identified and acted as the firm's "Managing Attorney." Respondent remained in that capacity at the firm until her phased departure mid-2011, practicing primarily from the firm's Beltsville office. Following her departure from the firm, Respondent continued to represent a number of her Glenmore clients in bankruptcy, federal court, and non-Maryland matters, and she did not seek or accept any attorneys' fees for her continuing client services.

## Attorney Trust Accounts

As Managing Attorney, Respondent opened Glenmore's two attorney trust accounts, one in Maryland and one in the District of Columbia. The account forms

identified the account as "Glenmore Law Firm, PLLC, IOLTA." The bank records did not reflect any designation of either account as an "Attorney Trust Account," "Clients' Funds Account," or "Escrow Account," nor was Glenmore designated as an LLC. The forms also identified Respondent as the "Managing Partner," and she repeated that designation when she signed the documents. Respondent was the sole signatory on the two trust accounts. She was also a signatory on Glenmore's operating account, and was responsible for determining when to move funds from the trust accounts to the firm operating account.

The firm employed an office staff including an accounting department. Respondent oversaw the accounting department's operations related to firm accounting records, including ledgers, bank statements, and monthly reconciliations, and reviewed those records from time to time.[14] Respondent was also responsible for ensuring compliance with Maryland trust account rules. She testified that she believed she had fulfilled her responsibility by instructing the office staff regarding which funds received from clients should be deposited into the trust account. As stated by the hearing judge, Respondent instructed the staff that "litigation" fees should be deposited into the attorney trust account, but "client retainer monies were not required to be deposited into the trust account if those sums were intended for the cost of audits to be conducted by contractors." On two occasions, Respondent inquired and raised concerns as to account errors regarding the accounting staff's failure to deposit a client payment into the attorney

---

[14] The firm's internal accounting records were not introduced at the hearing.

trust account. As a result, she informed Mr. Gaynor and the accounting staff that such lapses should not happen again.

## Glenmore Clients

In addition to managing the firm's finances, Respondent signed retainer agreements and "Welcome to Glenmore Law Firm" form letters that were given to clients. Respondent signed these letters in her capacity as Managing Attorney. Respondent also regularly signed, as Managing Attorney, "Cease and Desist" form letters that were sent to clients' lenders, informing the lenders of Glenmore's representation of the respective clients and requesting documentation concerning the clients' loans. Respondent testified that she conducted or participated in client intake meetings from time to time, but that she did not have any "initial" meetings with any of the clients who testified in these proceedings. Respondent further testified that she performed no analysis of new client matters, believed she was responsible only for her own cases, and did not supervise other attorneys. In addition, as stated by the hearing judge, "[s]he testified that she was not hired to do loan modifications, and did not do any loan modification work, and thus, had no occasion to provide any reports to clients on loan modification matters."

## Edna Kaileigh-Bailey

Respondent met with Edna Kaileigh-Bailey ("Ms. Kaileigh-Bailey") in September 2010 when Ms. Kaileigh-Bailey sought assistance with regard to a mortgage loan modification related to her property located in Nottingham, Maryland. Respondent provided her with a retainer agreement and letter of representation. The retainer

7

agreement, signed by Ms. Kaileigh-Bailey and Respondent on September 25, 2010, specifically referenced Respondent as the "Managing Attorney" of Glenmore. During their September 25, 2010, meeting, Ms. Kaileigh-Bailey provided Respondent a package of loan documents from her mortgage lender.

The retainer agreement specified that Glenmore required a retainer amount of $5,000. On or about September 28, 2010, Ms. Kaileigh-Bailey made a payment to Glenmore by credit card in the amount of $1,500. Ms. Kaileigh-Bailey paid Glenmore an additional $3,395 approximately between October 5, 2010 through December 7, 2010. Ms. Kaileigh-Bailey's receipts reflect that her payments were for "litigation" services. Comparison of the firm's billing records and bank account statements indicate that one or more of Ms. Kaileigh-Bailey's fee payments were not deposited into the firm's attorney trust account. In addition, a firm invoice dated October 22, 2010 states that an October 5, 2010 payment of $1500 was "Deposited to [the] Operating [account] as Requested [by] Mr. Newton."

On October 22, 2010, Glenmore sent Ms. Kaileigh-Bailey an invoice for $5,000.00 for "litigation services." Ms. Kaileigh-Bailey sent Glenmore a letter dated October 29, 2010, stating that she was "satisfied with the audit" that had been completed by Glenmore, but requested the return of "the balance of money for services that were not rendered." Ms. Kaileigh-Bailey received another invoice, dated December 29, 2010, billing Ms. Kaileigh-Bailey two hours for services identified as "Drafted Cease and Desist letter week October 29, 2010." Thereafter, on January 4, 2011, Respondent sent

Ms. Kaileigh-Bailey a letter entitled "Privileged & Confidential Attorney-Client Communication," an invoice for $5,895.00, and authorized a refund of $305.00.

Ms. Kaileigh-Bailey testified that she believed that Respondent was her attorney, and that she repeatedly called Glenmore asking to speak with Respondent. Respondent met with Ms. Kaileigh-Bailey on March 11, 2011, at which time Respondent and Ms. Kaileigh-Bailey signed a new retainer agreement. Nevertheless, Ms. Kaileigh-Bailey testified that Respondent failed to keep her informed of the status of her matter, stating: "I called [Glenmore] so many times. And they started charging me for the calls, as you can see, so I stopped. And I paid for the calls, $1,800.00, for every call I made." On June 21, 2011, Ms. Kaileigh-Bailey sent another letter to Respondent stating that nothing had been done to assist her with her loan modification and requesting a refund. As stated by the hearing judge, despite Ms. Kaileigh-Bailey's "urgent interest to negotiate a modification of her mortgage loan, Respondent did not take any action, or oversee any work on the client's behalf, or move to communicate with [the lender] on the client's behalf until preparing the form 'Cease and Desist' letter." The hearing judge found that the firm's billing records reflected that no legal work on Ms. Kaileigh-Bailey's account was undertaken until the week of October 29, 2010, at the earliest, when the "Cease and Desist" letter was drafted. Ms. Kaileigh-Bailey testified that she terminated her relationship with Respondent and Glenmore, and necessarily pursued her mortgage loan modification efforts herself.

## Helene Cunningham and Robert Beebe

Helene Cunningham and Robert Beebe retained Glenmore in early March 2011 to assist them with obtaining a mortgage loan modification. Ms. Cunningham and Mr. Beebe met with Shiva Arati, a Glenmore attorney. Following the meeting with Mr. Arati, Ms. Cunningham and Mr. Beebe met with Respondent, who, as "Managing Attorney," signed a retainer agreement, described as a "Welcome to Glenmore" letter, for Ms. Cunningham and Mr. Beebe. On the same date, Respondent also signed a "Cease and Desist" letter on behalf of Ms. Cunningham and Mr. Beebe addressed to their lender, Bank of America.

Glenmore sent Ms. Cunningham and Mr. Beebe an invoice dated May 20, 2011, reflecting charges for services including the preparation of the "Cease and Desist" form letter and sending a certified letter to Bank of America. Although Ms. Cunningham and Mr. Beebe remitted a total of $8,554.28 in attorney's fees to Glenmore, they testified that they never received any discernible legal services from Respondent or any of Glenmore's other staff members. The firm's billing records also reflect that the firm did not complete any substantive work to earn the fees paid by Ms. Cunningham and Mr. Beebe. In addition, comparison of the firm's billing records and bank account statements indicate that two payments made by Ms. Cunningham and Mr. Beebe were not deposited into the firm's attorney trust account.

**Katrina and Paul Smith**

Katrina and Paul Smith ("the Smiths") retained Glenmore in March 2011 seeking assistance with a modification of their mortgage loan. Respondent "was assigned to [the Smith] file" and directed a non-lawyer, identified as C. Bowman, to tell the Smiths to submit their mortgage documents for review. Respondent signed a retainer agreement with the Smiths and a "Cease and Desist" letter addressed to the Smiths' lender dated March 30, 2011. Thereafter, no further services were provided to the Smiths. Ms. Smith testified that she made 30 or 40 telephone calls to Respondent that were not returned, and that Respondent was never available to the Smiths. Thus, the Smiths paid fees to the firm that were never earned. In addition, comparison of the firm's billing records and bank account statements reveals that a payment of $1,500 made by Mrs. Smith on March 29, 2011 was not deposited into the firm's attorney trust account.

**Joyce and William Whitaker**

In July 2010, Joyce and William Whitaker ("the Whitakers") contacted Glenmore about a loan modification and met with Mr. Gaynor, who introduced them to Respondent. Ms. Whitaker testified that she believed Respondent conducted an audit for them. Mr. Gaynor telephoned the Whitakers, asking them to return for an additional meeting. He reported that the audit had discovered some problems, and that a loan modification could be negotiated. Respondent signed and sent a "Cease and Desist" letter dated November 16, 2010, on behalf of the Whitakers to the Whitakers' lender. Respondent testified that she did meet with the Whitakers, but that she did not recall having any responsibility to

11

perform work for the Whitakers.

The Whitakers paid $895 for the audit and an additional $5,000 over the course of several months for additional services. Comparison of the firm's billing records and bank account statements produced at the hearing demonstrates that two payments made by the Whitakers were not deposited into the firm's attorney trust account. In August 2011, the Whitakers learned from a Virginia law firm that a foreclosure auction was scheduled for their residence and they therefore concluded that Glenmore had not undertaken or performed any legal services on their behalf.

**Debra Lampton**

Mr. Arati, while employed as a Glenmore attorney, filed a lawsuit on behalf of Debra Lampton ("Ms. Lampton") in the Circuit Court for Prince George's County. The lawsuit was subsequently removed to the United States District Court for the District of Maryland. After Mr. Arati left the firm, Respondent sought to enter her appearance in the case for a limited time and purpose. United States District Court Judge Roger Titus directed Respondent, appearing to respond to his Show Cause Order, to continue to represent Ms. Lampton, and chastised her as follows:

THE COURT: . . .You entered your appearance for the plaintiff in this case.

MS. SHEPHARD: My intention, Your Honor, was to a limited appearance.

THE COURT: Now, you don't do limit[ed] appearances. Lawyers represent clients. You don't represent the Glenmore Law Firm. You entered your appearance for this client [Debra Lampton]. This client is now adrift, with nothing being done for this client, and this client had a serious case that was filed in the Prince George's County Circuit Court, removed to

12

this court.  You entered your appearance.  You asked for more time so the law firm could investigate something that apparently wasn't investigated very much in the first place.  And you have a responsibility to this client. It is your personal responsibility.  You are a member of the bar of this court.

MS. SHEPHARD: Your Honor, if I may, the case before the [c]ourt, Ms. Lampton, was a case, as it indicated, that was handled by Mr. Arati.  I in no way intended to represent Ms. Lampton.

THE COURT: When you file your appearance on behalf of a client, you are representing the client.

MS. SHEPHARD: That was not my intent.

THE COURT: Well, it may not have been your intention, but as a matter of law when you enter your appearance for a client you are representing that client.  This client is adrift.  Nothing is being done for this client.  Open motions are out there that have not been responded to and this client stands to lose her entire case because you have not done anything.

MS. SHEPHARD: Okay.  Fine.  I disagree with the [c]ourt, but that's fine.

THE COURT: Well, you're going to have to understand that this client is represented by you now.  If you wish to withdraw your appearance, you need to make a motion to withdraw your appearance.  And something needs to be done to get services, legal services for this client.  This client has been abandoned, and this [is] just not something this [c]ourt is going to tolerate. . . .

The hearing judge, in this disciplinary proceeding, found that Respondent competently represented Ms. Lampton after she was obliged by Judge Titus to undertake that representation, and eventually she was able to negotiate a satisfactory settlement on behalf of Ms. Lampton.  Ms. Lampton testified that she was satisfied with Respondent's services, and that she never had any difficulties in communicating with Respondent.

13

**Aggravation**

The hearing judge made no findings as to mitigation. As to aggravation, however, Judge White found that Respondent "diminishe[d] the nature and character of her role as Glenmore's 'Managing Attorney' to that of a ministerial functionary." Based on her findings of fact, Judge White concluded that Respondent's responsibilities, which included "directing, conducting, [and] necessarily controlling the client work and attorney assignments," were "far beyond the merely ministerial." In addition, the hearing judge specifically rejected Respondent's reliance on the "Memorandum of Understanding" she signed with the firm, as a description of her role as an independent contractor rather than a supervisor at the firm. In Judge White's view, this reliance on the "Memorandum" as well as Respondent's repeated denials regarding her responsibilities "serve to aggravate both the perception and reality that Respondent defaulted on her professional responsibilities to clients in Maryland, where she was not authorized to practice law."

**Conclusion**

Accordingly, the hearing judge entered detailed conclusions of law, in which she found, by clear and convincing evidence, that Respondent violated MLRPC 1.1, 1.2(a), 1.3, 1.4(a), 1.5(a), 1.15(a), (c), and (d), 5.3, 5.5, and 8.4(d), and Maryland Rule 16-606.1. The hearing judge further concluded that Respondent did not violate either MLRPC 5.1 or BOP § 10-306.

## DISCUSSION

"This Court has original and complete jurisdiction over attorney discipline proceedings in Maryland." *Attorney Grievance Comm'n v. Barton*, 442 Md. 91, 119, 110 A.3d 668, 684 (2015) (quoting *Attorney Grievance Comm'n v. O'Leary*, 433 Md. 2, 28, 69 A.3d 1121, 1136 (2013)). The Court conducts an independent review of the record, "giv[ing] deference to the hearing judge's assessment of the credibility of the witnesses." *Attorney Grievance Comm'n v. Thomas*, 409 Md. 121, 147, 973 A.2d 185, 201 (2009). "With respect to exceptions, upon our review of the record, the hearing judge's findings of fact generally will be accepted unless they are clearly erroneous. A hearing judge's factual finding is not clearly erroneous if there is any competent material evidence to support it." *Barton*, 442 Md. at 119, 110 A.3d at 684 (internal citations and quotations omitted). We review the hearing judge's conclusions of law for legal correctness. Md. Rule 16-759(b)(1).

Petitioner filed no exceptions to the hearing judge's findings of fact and conclusions of law, and recommends that Respondent be disbarred. Respondent filed numerous exceptions to both the hearing judge's findings of fact and conclusions of law.

### Respondent's Exceptions to Findings of Fact

First, Respondent excepts to the finding that "one of the reasons [she] left Glenmore was her concern about the unauthorized practice of law." Based upon our independent review of the record, we find no evidence to support this finding. Accordingly, we sustain this exception.

15

Exceptions Regarding Ms. Kaileigh-Bailey

Respondent excepts to the hearing judge's finding that she held herself out to Ms. Kaileigh-Bailey as a Maryland attorney. She also excepts to the finding that she reviewed Ms. Kaileigh-Bailey's documents for the purpose of addressing the client's request for a loan modification, which, in any event, Respondent argues, constitutes a task that a paralegal could (and, at Glenmore, often did) complete. Respondent contends that when she met with Ms. Kaileigh-Bailey, she simply received the documents and the two had no further meetings or conversations. We shall overrule in part and sustain in part Respondent's exceptions regarding Ms. Kaileigh-Bailey.

Notably, all of Respondent's written communications with Ms. Kaileigh-Bailey serve to indicate that Respondent was a Maryland attorney and that either she or her law firm would render legal services. Respondent's September 25, 2010, "Attorney Retainer Agreement" with Ms. Kaileigh-Bailey specifically states that "[o]ur duties will include advising and counseling you by investigating the law and facts, and seeking the release of any deficiencies levied against you as a result of foreclosure." On March 11, 2011, Respondent and Ms. Kaileigh-Bailey signed a second retainer agreement authorizing Glenmore to act as Ms. Kaileigh-Bailey's "attorneys-in-fact." Both agreements include Respondent's signature as "Managing Attorney." On January 4, 2011, Respondent sent Ms. Kaileigh-Bailey a letter entitled "Privileged & Confidential Attorney-Client Communication." In addition, an invoice from Glenmore describes a charge for Ms. Kaileigh-Bailey's meeting with Respondent as "litigation services." Moreover,

16

Respondent and Ms. Kaileigh-Bailey met at least twice in order to sign the first and then the second retainer agreements, and the second retainer agreement specifically included additional paragraphs detailing the scope of the attorney-client relationship.

In addition, the record does not disclose any instance in which Respondent disclosed her jurisdictional limitations with respect to Maryland. Where a law firm's primary office is located in Maryland, the presence of state designations such as "VA" and "DC" on firm letterhead next to the Managing Attorney's name, without more, implies that the attorney is barred in Virginia and the District of Columbia in addition to Maryland. *See Attorney Grievance Comm'n v. Alsafty*, 379 Md. 1, 7, 838 A.2d 1213, 1217 (2003) (accepting the hearing judge's conclusion that "[i]t is a common practice to designate the other jurisdictions in which an attorney is licensed to practice in addition to the state where his/her principal offices are located"). Based on this record, we are unable to conclude that Judge White's finding that Respondent held herself out to Ms. Kaileigh-Bailey as a Maryland attorney is clearly erroneous. Therefore, we overrule this exception.

We will, however, sustain Respondent's exception to the hearing judge's finding that she reviewed Ms. Kaileigh-Bailey's documents for the purpose of addressing her loan modification. We agree with Respondent that the record does not demonstrate that Respondent actually reviewed Ms. Kaileigh-Bailey's documents. The record indicates only that Respondent received the documents during her meeting with Ms. Kaileigh-Bailey.

17

<u>Exceptions Regarding the Smiths</u>

Next, Respondent excepts to the finding that she was assigned to the Smiths' file and that "Ms. Smith made 30 to 40 telephone calls to [Respondent]." The record demonstrates that on March 30, 2011, Respondent signed and sent a form "Cease and Desist" letter to HSBC Mortgage Services on behalf of the Smiths. At the evidentiary hearing, Ms. Smith testified that she understood Respondent to be her attorney and that, some time in March 2011, Respondent contacted her by telephone, stating that "[Respondent] had sent out [Ms. Smith's] documents to [Ms. Smith's] mortgage lender, which is HSBC, and that [Respondent] [would] be getting back to [Ms. Smith]." Accordingly, the record demonstrates clearly that, whether or not she was specifically assigned to the Smiths' file or did any substantive work on their behalf, Respondent held herself out to the Smiths and to the Smiths' lender as the attorney working on or responsible for their matter.

In addition, Respondent bases her exception to the finding that "Ms. Smith made 30 to 40 telephone calls" to her on her contention that Ms. Smith lacks credibility. Respondent asserts that Ms. Smith's testimony should be discredited in part because the testimony was that Ms. Smith telephoned the firm, and there was no evidence presented that Respondent was aware of the Smiths' attempts to contact her. "The general rule is that we defer to the credibility findings of the hearing judge." *Attorney Grievance Comm'n v. Agbaje*, 438 Md. 695, 722, 93 A.3d 262, 277 (2014). Where the hearing judge apparently found Ms. Smith's testimony to be more credible than Respondent's, and

18

absent any indication that the hearing judge's findings were clearly erroneous, we decline to overrule this exception.

Exceptions Regarding Respondent's Responsibilities

Respondent excepts to Judge White's finding that she was responsible for supervising the work of Glenmore attorney Shiva Arati. Respondent asserts that she "did not supervise any of the Glenmore attorneys, who, like her, were independent contractors." Although there is evidence to suggest that Ms. Shephard had supervisory responsibilities in Glenmore (for example, her title was "Managing Attorney"), the hearing judge's specific findings with regard to supervision of other attorneys are somewhat contradictory. On the one hand, the hearing judge found that Respondent "did not undertake to supervise or instruct other attorneys." On the other hand, the hearing judge found that "Ms. Shephard was responsible for supervising Arati's work for the firm's clients." In conducting our independent review, we do not find competent evidence in the record to support the conclusion that Respondent supervised Arati's work. Based upon our independent review, and further considering that the hearing judge did not find that Respondent violated MLRPC 5.1 (concerning the supervision of subordinate lawyers), we sustain this exception.

Exceptions Regarding Aggravation

Finally, Respondent excepts to Judge White's findings regarding aggravation. She excepts to the finding that "she represented herself to firm clients as one who was responsible for directing, conducting, and controlling client work and attorney

19

assignments." She further states that she "attempted to perform her professional responsibilities to the best of her ability" and that "her testimony genuinely reflected the actuality of Glenmore's structure and operations and her role and activities within the firm." The fact that Respondent repeatedly represented herself to firm clients as Glenmore's Managing Attorney, such as by signing retainer agreements as "Managing Attorney" and sending "Cease and Desist" letters on clients' behalf, plainly contradicts Respondent's assertion that she did not take on the responsibilities that led to the instant disciplinary action. Moreover, based on Respondent's repeated denials of her responsibility in these matters, which she continues in her exceptions to this Court, we shall overrule this exception. In sum, consistent with the above, we conclude that the hearing judge's findings that Respondent held herself out as the managing attorney of Glenmore, with responsibilities over the firm's attorney trust account and multiple client matters, were not clearly erroneous.

## Conclusions of Law – Respondent's Violations and Exceptions

As a general matter, Respondent excepts to all conclusions relating to her perceived responsibilities as Glenmore's "Managing Attorney." She argues that the hearing judge incorrectly equated her with Glenmore as though their obligations were identical, rather than focusing on Respondent's own direct and personal involvement with Glenmore operations and clients. Essentially, Respondent contends that she is being held unreasonably "vicariously liable" for all activities undertaken by Glenmore as an entity by virtue of her title as "Managing Attorney."

20

The notion of vicarious responsibility in attorney discipline cases generally arises in the context of MLRPC 5.1[15] and 5.3 violations. MLRPC 5.1 and 5.3 govern a lawyer's responsibilities regarding supervision of subordinate lawyers and nonlawyer assistants. Subsection (c) of each of those rules, respectively, makes a lawyer vicariously responsible for a subordinate lawyer's violation of another rule or a nonlawyer's conduct that, if performed by a lawyer, would constitute a violation of another rule. *Attorney Grievance Comm'n v. McDowell*, 439 Md. 26, 42 n.10, 44 n.11, 93 A.3d 711, 721 n.10, 721 n.11 (2014). Our rules place the burden on partners or managing attorneys to ensure that their firm and staff are in compliance with their professional obligations. *See Attorney Grievance Comm'n v. Johnson*, 409 Md. 470, 506-07, 976 A.2d 245, 266 (2009) ("[Respondent] cannot shift the responsibility for the HUD–1 misrepresentations and overall fraud committed by [his company] to an employee when he was clearly in a position of management and authority."); *Attorney Grievance Comm'n v. Glenn*, 341 Md. 448, 479, 671 A.2d 463, 478 (1996) ("An attorney must ascertain that his or her employees perform their responsibilities in a competent manner."); *Attorney Grievance Comm'n v. Goldberg*, 292 Md. 650, 655, 441 A.2d 338, 341 (1982) ("An attorney may not escape responsibility to his clients by blithely saying that any shortcomings are solely the fault of his employee.").

*Attorney Grievance Commission v. Kimmel*, 405 Md. 647, 955 A.2d 269 (2008), is

---

[15] The Petition, as amended, did not charge Respondent with a violation of MLRPC 5.1.

instructive.  In that case, partners of a Pennsylvania law firm ("K & S") hired a Maryland lawyer inexperienced in civil trial work to open and operate a new office for the firm located in Maryland.  *Kimmel*, 405 Md. at 653-55, 955 A.2d at 273-74.  After completing one month of training at the firm's home office in Pennsylvania, the new associate, Ms. Katz, began taking on a significant number of civil cases in Maryland.  *Kimmel*, 405 Md. at 655-56, 955 A.2d at 274.  Katz soon became overwhelmed and began missing numerous discovery deadlines, leading to dismissals in forty-seven cases.  *Kimmel*, 405 Md. at 661, 955 A.2d at 277-78.  Approximately one year after beginning her employment with the firm, Katz resigned and the managing partners of K & S began to resolve client problems that had accrued due to Katz's inaction.  *Kimmel*, 405 Md. at 663, 955 A.2d at 279.  Subsequently, Bar Counsel charged the partners with failure to supervise adequately the Maryland associate in violation of MLRPC 5.1, and failure to communicate with one of the clients adversely affected by the associate's ineptitude, in violation of MLRPC 1.4.  *Kimmel*, 405 Md. at 651-52, 955 A.2d at 272.

In addressing the MLRPC 5.1 violation, we explained that "[o]ur Rules require that a firm's executive lawyers design and implement supervisory procedures that anticipate the ethical demands specific to the practice they lead."  *Kimmel*, 405 Md. at 672, 955 A.2d at 284.  Perhaps more telling as to the responsibilities and burden placed on managing attorneys is our discussion in *Kimmel* regarding the MLRPC 1.4 violation.  The partners argued that they should not be held responsible for the failure to communicate with one of the affected Maryland clients because only the associate was

22

the counsel of record for that client. *Kimmel*, 405 Md. at 683, 955 A.2d at 290-91. We strongly disagreed, stating that the client hired the firm, not the individual associate. *Id.* We explained:

> The onus was on Respondents [the partners], when [the associate] resigned, to ensure that a response was made promptly to inquiries submitted to the firm by affected clients. To conclude otherwise would mean that a firm would have no responsibility to respond to its clients if a matter became unassigned, for any reason, to a specific attorney within the firm. . . . The purpose of the Rule would be thwarted if the firm [the client] hired was not obligated to respond to his inquiries in such circumstances. Respondents, as the firm's managers, are accountable for this actionable delay.

*Id.*

Respondent suggests that, were we to fail to sustain her exceptions, future partners could be held responsible–personally, not just for inadequate supervision–for all the failures of their subordinates even if those partners merely signed welcome letters as a matter of course when clients retained their firms. This case, however, involves an attorney signing not just a welcome letter that outlines the firm's responsibilities, obligations, and promises to the client, but also meeting with clients, signing cease and desist letters addressed to clients' mortgage lenders and communicating with clients about ongoing matters. A lawyer should understand that these kinds of activities constitute the representation of a client, and that representation carries with it a set of professional responsibilities that a lawyer with 18 years of experience will be expected to understand. Moreover, an attorney in Maryland engaging in conduct like Respondent's has a duty either to follow through on the representation of clients or to make sure that another

23

attorney ably represents those clients.

In any event, Respondent took the title as well as certain responsibilities as Glenmore's "Managing Attorney." Her management responsibilities included, primarily, the oversight of the firm's attorney trust account. In addition, as stated by the hearing judge, Respondent "understood that her duties ordinarily included trying to resolve client complaints, making suggestions to Mr. Gaynor for attorneys' assignment to cases, and meeting with bankruptcy clients or describing other firm services to be offered to clients." It is Respondent's failure to uphold her responsibilities that have led to these disciplinary proceedings. As we shall explain, the overall theory of Respondent's responsibility in this matter is based on her own negligence in acting as a Maryland attorney in the representation of clients and inadequately managing Glenmore's attorney trust account. As our discussion below makes clear, Respondent is responsible for her own failures and the consequences of accepting a managerial position.

## MLRPC 1.1 (Competence)

MLRPC 1.1 provides that "[a] lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." Competent representation includes proper treatment and maintenance of client funds in a trust account. *Attorney Grievance Comm'n v. Bell*, 432 Md. 542, 552, 69 A.3d, 1040, 1046 (2013) ("Incorporated within the competence requirement is a lawyer's duty to properly maintain his trust account."); *Attorney Grievance Comm'n v. Maignan*, 390 Md. 287, 296-97, 888 A.2d

24

344, 349 (2005) (agreeing that an attorney's "failure to maintain [client] funds in a proper trust account demonstrates incompetence under MLRPC 1.1"); *Attorney Grievance Comm'n v. Brown*, 380 Md. 661, 667-68, 846 A.2d 428, 432 (2004) ("The [r]espondent's failure to properly maintain [the client's] settlement monies in his escrow account demonstrates his incompetence pursuant to Rule 1.1.").

In this case, Respondent testified that she was the only person at Glenmore with authority over the trust accounts and that she was responsible for reviewing the accounts. The responsibility to properly maintain the accounts under MLRPC 1.1 therefore fell to her. The hearing judge found that multiple payments of unearned attorney's fees were not deposited into the attorney trust account. Although Respondent originally filed an exception with regard to MLRPC 1.1, Respondent's attorney conceded during oral argument before this Court that Respondent failed to ensure that funds were properly deposited in the trust account. Accordingly, we agree with the hearing judge that Respondent was incompetent for failing to maintain unearned client funds in the firm's trust account without the client's consent in violation of MLRPC 1.1.

MLRPC 1.2 (Scope of Representation), 1.3 (Diligence), and 1.4 (Communication)

The hearing judge concluded that Respondent violated MLRPC 1.2(a), 1.3, and 1.4(a)(2) by failing to perform the work promised to clients, and by failing to respond timely or keep clients informed about the status of their cases. Respondent excepts to these conclusions on the basis that she did not owe a personal responsibility to these clients because they were clients of *the firm*. The failures of Glenmore, as an entity,

25

Respondent argues, do not establish violations of professional obligations owed by Respondent personally under these Rules. Respondent asserts that the evidence does not support a conclusion that, after signing the "Welcome to Glenmore" and "Cease and Desist" letters, Respondent undertook, or should be charged with, a personal responsibility for the representation of these former clients. We overrule these exceptions.

In essence, Respondent avers that no attorney-client relationship existed between her and the clients. As we explain throughout this opinion, Respondent's contact and involvement in each client matter extended beyond mere incidental involvement. Indeed, Respondent, among other things, signed retainer agreements identifying herself as the "Managing Attorney" and signed "Cease and Desist" letters to lenders on behalf of clients. In light of her involvement with each client's legal matter it is unsurprising that Ms. Kaileigh-Bailey expressly testified that she believed Respondent to be her attorney, or that Ms. Kaileigh-Bailey, along with the Smiths, made repeated attempts to contact Respondent during their representation.

Rule 1.2(a) requires that "a lawyer shall abide by a client's decisions concerning the objectives of the representation and, where appropriate, shall consult with the client as to the means by which they are to be pursued." We have explained:

> When a lawyer fails to take any steps towards the client's objective, the lawyer necessarily fails to abide by the client's decision concerning that objective. Moreover, we have held that the failure to prosecute a client's case, combined with a failure to communicate with the client about the status of the case, constitutes a violation of MLRPC 1.2(a).

26

*Attorney Grievance Comm'n v. Garrett*, 427 Md. 209, 223, 46 A.3d 1169, 1177 (2012) (citations omitted). All of the clients at the hearing testified that they did not receive the services for which they sought assistance and were billed. As their attorney, Respondent was required to ensure that the clients received the services promised to them and that the clients remained reasonably informed of the status of their cases. Respondent's failure to do so clearly establishes a violation of Rule 1.2(a). *See id.* (concluding that the attorney violated Rule 1.2(a) where "the hearing judge found the necessary combination of a failure to pursue a client matter and a failure to communicate with the client about the status of the matter").

MLRPC 1.3 requires that "[a] lawyer shall act with reasonable diligence and promptness in representing a client." "A lawyer who takes 'no action whatsoever' in representing a client violates this rule." *Attorney Grievance Comm'n v. Gage-Cohen*, 440 Md. 191, 198, 101 A.3d 1043, 1047 (2014) (citation omitted). As noted above, Respondent failed to provide the services for which the clients sought assistance. Indeed, after signing the "Cease and Desist" letters on the behalf of Ms. Kaileigh-Bailey, Ms. Cunningham and Mr. Beebe, the Smiths, and the Whitakers, Respondent took no action on behalf of these clients. This failure to take action for or on behalf of her clients violates Rule 1.3.

MLRPC 1.4(a)(2) requires an attorney to "keep the client reasonably informed about the status of the matter." We have stated that "[a]ttorneys violate MLRPC 1.4

27

when they fail to communicate with their clients and keep them informed of the status of their legal matters, especially when clients attempt repeatedly to speak with them." *Attorney Grievance Comm'n v. Thomas*, 440 Md. 523, 553, 103 A.3d 629, 647 (2014). In this case, Ms. Smith and Ms. Kaileigh-Bailey testified that they repeatedly attempted to contact Respondent to no avail. Similarly, the Whitakers only discovered that their matter had not been pursued when they learned from a Virginia law firm that a foreclosure auction was scheduled for their residence. Thus, Respondent's conduct in this case clearly demonstrates a failure to keep clients informed about the status of their cases, in violation of MLRPC 1.4(a)(2).

## Rule 1.5 (Fees)

MLPRC 1.5(a) provides that "[a] lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses." As we have previously explained, "[w]hen an attorney charges a fee but does no work, the fee is *per se* unreasonable. It is irrelevant that the fee [was] 'initially reasonable' if the attorney fails to perform any of the services for which the attorney was paid." *Gage-Cohen*, 440 Md. at 198-99, 101 A.3d at 1047 (emphasis in original) (citations omitted). In this case, the hearing judge found a violation of MLRPC 1.5(a) where Glenmore collected fees for legal services that were not delivered.

Respondent excepts to this conclusion on the grounds that client fees "were paid to *Glenmore*, not to [Respondent], [and] client services were to be performed by various Glenmore attorneys or contractors" other than Respondent. (Emphasis in original).

28

Moreover, she asserts that even if she were a true managing attorney, she should not be held vicariously responsible for acts in which she did not personally participate. Respondent maintains that it would be unfair to find her responsible under a rule concerning personal conduct when she did not personally take money from clients. Under the facts of this case, we disagree.

The record demonstrates that Respondent signed retainer agreements–requesting funds–as well as invoices charging clients for services that clients never received. She also authorized a refund of client fees in at least one instance. These activities, combined with Respondent's admission that she maintained responsibility for the firm's attorney trust account as well as decision making regarding where funds were to be deposited, demonstrate that Respondent had at least some authority over the collection of fees. Moreover, acting as an attorney representing clients, Respondent has a responsibility to ensure that client fees are collected only for work actually performed, and that a client receives adequate representation. Respondent failed to carry out those responsibilities, and therefore we agree with the hearing judge that she violated MLRPC 1.5.

### Rule 1.15 (Safekeeping Property)

The hearing judge concluded that Respondent violated MLRPC 1.15(a), (c), and (d). MLRPC 1.15(a) requires that "[f]unds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules, and records shall be created and maintained in accordance with the Rules in that Chapter." MLRPC 1.15(c) requires a lawyer to obtain informed consent, in writing, to any fee arrangement other than one

requiring Respondent to deposit fees paid in advance into a trust account. MLRPC 1.15(d) requires a lawyer to "deliver promptly to the client. . . any funds or other property that the client. . . is entitled to receive." In sum, Rule 1.15 "mandates that attorneys 'maintain a separate account to safeguard funds of clients . . . and . . . deposit unearned fees into the client trust account, unless the client gives informed consent, confirmed in writing, to a different arrangement.'" *Gage-Cohen*, 440 Md. at 200-01, 101 A.3d at 1048 (citation omitted). *See also Attorney Grievance Comm'n v. Khandpur*, 421 Md. 1, 16, 25 A.3d 165, 174 (2011) ("Our cases hold that fee payments, even if a flat fee, must be placed in escrow upon receipt if the work has not yet been performed at the time of payment.").

Respondent argues that she did not violate Rule 1.15 because (1) she instructed staff on proper attorney trust account procedures, (2) she attempted to correct trust account irregularities when she observed them, and (3) there is no evidence that she personally deposited, authorized or approved a deposit, or withdrew funds in contravention of the Maryland rules regarding attorney trust accounts. She maintains that to hold otherwise would be to impermissibly hold her vicariously responsible for such a violation. We overrule this exception.

Respondent was the sole person at Glenmore with authority over the trust accounts. That Ms. Shephard instructed staff on proper procedures is insufficient on its own to avoid violating MLRPC 1.15. As the attorney managing the firm's trust account, it was Respondent's responsibility to ensure that client funds were properly deposited

30

and/or maintained in an attorney trust account. The failure to do so, evidenced in the record here, constitutes a violation of MLRPC 1.15(a). Further, no informed consent was obtained that might have authorized a different arrangement, in violation of MLRPC 1.15(c). As the sole person with responsibility for keeping the trust accounts in conformance with Maryland Rules, Respondent was expected to direct that these unearned (and not intended to be earned) fees be refunded. Her failure to do so clearly constitutes a violation of MLRPC 1.15(d).

Rule 5.3 (Responsibilities Regarding Nonlawyer Assistants)

MLRPC 5.3 provides in relevant part that "a lawyer having direct supervisory authority over [a] nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer." It is well established that these obligations include those relating to the maintenance of an attorney trust account. *See, e.g., Attorney Grievance Comm'n v. Kobin*, 432 Md. 565, 582, 69 A.3d 1053, 1064 (2013) (concluding that the "respondent violated MLRPC 5.3 by failing to advise [his non-lawyer assistant] of the rules regarding trust accounts or . . . how to comply with those rules." Here, the hearing judge concluded that Respondent violated Rule 5.3 by failing to properly supervise non-lawyer assistants who mishandled trust account funds. Although Respondent originally excepted to this conclusion, her attorney conceded at oral argument that Respondent failed to uphold her responsibilities in relation to the trust account.

As the sole person at Glenmore with authority over the firm's trust accounts,

31

Respondent had a responsibility under MLRPC 5.3 to affirmatively monitor the employees with whom she tasked the maintenance of the firm's trust accounts. An attorney violates MLRPC 5.3 "when an attorney delegates a task to an employee, the unsuccessful or improper completion of which would result in a violation of the Rules." *Attorney Grievance Comm'n v. Barton*, 442 Md. 91, 136, 110 A.3d 668, 694 (2015). For example, in *Attorney Grievance Commission v. Zuckerman*, 386 Md. 341, 872 A.2d 693 (2005), we held that an attorney violated MLRPC 5.3(a) and (b) by failing to supervise adequately his assistant to whom he assigned the task of balancing his attorney trust account. In that case, the nonlawyer employee failed to properly balance the checkbook, and as a result, the employee and the attorney did not discover timely a theft from his trust account by one of his other employees. *Zuckerman*, 386 Md. at 352, 872 A.2d at 700. We explained that the lawyer's failure to oversee his employees' tasks violated the MLRPC because he failed to "make reasonable efforts to ensure that his employees' conduct complied with his own professional obligations." *Zuckerman*, 386 Md. at 374, 872 A.2d at 712-13. Similarly, in this case, the fact that Respondent instructed staff on proper procedures is insufficient. As the attorney overseeing the trust accounts, Respondent had an affirmative duty to continue to supervise the accounting department to ensure that the ethical obligations relating to the maintenance of the trust account were being met. Where the record discloses multiple instances of trust account mistakes and failures, we conclude that Respondent failed to supervise adequately her nonlawyer assistants.

Rule 5.5 (Unauthorized Practice of Law)

MLRPC 5.5 provides that "(a) [a] lawyer shall not practice law in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction[.]" Subsection (b) further prohibits "[a] lawyer who is not admitted to practice in this jurisdiction" from establishing "an office or other systematic and continuous presence in this jurisdiction for the practice of law" and from "hold[ing] out to the public or otherwise represent[ing] that the lawyer is admitted to practice law in this jurisdiction." Generally, "[t]o determine whether an individual has engaged in the practice of law, the focus of the inquiry should be on whether the activity in question required legal knowledge and skill in order to apply legal principles and precedent." *Attorney Grievance Comm'n v. Hallmon*, 343 Md. 390, 397, 681 A.2d 510, 514 (1996) (citations and quotations omitted).

Respondent excepts to the conclusion that she violated MLRPC 5.5 based on her assertion that the clients who testified in these proceedings sought legal assistance from Glenmore, not Respondent, and had only "incidental contact" with her.[16] She further contends that there is insufficient evidence to conclude that she prepared or interpreted legal documents, applied legal principles to legal problems, or otherwise provided legal services to clients other than for bankruptcy and other federal matters. We shall overrule Respondent's exception.

---

[16] Respondent also excepted to this conclusion on the grounds that "management of a trust account does not fall within the definition of the practice of law as requiring legal skill or knowledge." The hearing judge, however, did not rely on the fact that Respondent managed the firm's trust account to hold her responsible for a violation of MLRPC 5.5(b). Therefore, we do not address this argument.

33

We discussed the unauthorized practice of law under similar circumstances in *Attorney Grievance Commission v. Harris-Smith*, 356 Md. 72, 737 A.2d 567 (1999). In that case, Ms. Harris-Smith was an attorney licensed to practice in Pennsylvania, Virginia, the District of Columbia, and the United States District Court for the District of Maryland, but not the State of Maryland. *Harris-Smith*, 356 Md. at 74, 737 A.2d at 568. Ms. Harris-Smith limited her law practice to bankruptcy matters. *Id.* Her law practice was based out of a firm in Landover, Maryland, where she regularly met with clients. *Id.* In addition to meeting with her own bankruptcy clients, Ms. Harris-Smith engaged in "prescreening" interviews with prospective clients in order to identify their legal matters and refer them to the appropriate attorney within the firm. 356 Md. at 77, 737 A.2d at 570. Despite listing a Maryland address, Ms. Harris-Smith's law firm advertisements and business cards did not specify that she was not licensed to practice in Maryland. *Id.* Based upon her activities in Maryland, Bar Counsel charged Ms. Harris-Smith with the unauthorized practice of law in violation of MLRPC 5.5.

Before this Court, Ms. Harris-Smith argued that she did not engage in the unauthorized practice of law because her practice was limited to bankruptcy matters and, therefore, she was engaged in a solely federal practice.[17] In concluding that Ms. Harris-

_____

[17] We note that in this case, Petitioner has acknowledged the existence of a "federal overlay" for Respondent's conduct in the United States District Court proceeding on behalf of Ms. Lampton. *See Attorney Grievance Comm'n v. Alsafty*, 379 Md. 1, 19, 838 A.2d 1213, 1224 (2003) (explaining that the "federal overlay" of one's practice of law is tantamount to "a valid admission to the federal bar, and thus, a right to practice in Maryland, if done consistent with that admission[,]" and that "[t]he existence of the federal overlay negates any

(continued...)

34

Smith violated MLRPC 5.5, we explained that Ms. Harris-Smith held herself out as practicing law in Maryland and failed to advise clients that she limited her legal representation of them to specific bankruptcy matters. *Harris-Smith*, 356 Md. at 83, 737 A.2d at 573. In addition, we explained that the fact that Ms. Harris-Smith met with clients for the purpose of "triage" or "prescreening" further constituted the unauthorized practice of law. We stated:

> In determining that a bankruptcy proceeding in the Maryland District is the appropriate remedy for the client's problem, Harris-Smith was professionally required to review the facts and to decide the appropriate course of action, *e.g.*, to determine whether there were any contract defenses to the claims of the principal creditors. There is a danger that lawyers in the position in which Harris-Smith placed herself would be motivated to cant advice artificially in the safe direction. Further, there is always the danger that the operation of the triage by the unadmitted attorney, from an office for the general practice of law in Maryland, will be used as a shield behind which to conduct an unlimited-in-fact law practice.

356 Md. at 84, 737 A.2d at 573 (citations and quotations omitted).

Similarly, in *Attorney Grievance Commission v. Johnson*, 363 Md. 598, 625, 770 A.2d 130, 146 (2001), we concluded that Mr. Johnson, who asserted that he maintained a solely federal practice out of his law office located in Maryland, engaged in the unauthorized practice of law when he "met with clients in a Maryland office and advised clients in that office." In addition, Mr. Johnson "misled the public, as well as his clients,

_____

(...continued)
allegation of a deliberate and willful intent to violate the unauthorized practice Rule, where cases are brought only in federal court and no clients are represented in State court."). Nonetheless, it is the totality of Respondent's other actions, not related to the federal court case, that persuade us that she engaged in the unauthorized practice of law.

by not including his jurisdictional limitations on the firm's letterhead, which bore only a Maryland address." *Id.* We explained that Mr. Johnson "placed himself within the proper reach of our disciplinary investigatory authority under MLRPC 8.5(b)" because "he maintained an office in Maryland where he met clients, made phone calls to clients from his Maryland home, executed retainer agreements in Maryland, and 'routinely' sent out correspondence on letterhead that indicated a Maryland office but did not indicate [his] jurisdictional limitations." *Johnson*, 363 Md. at 628, 770 A.2d at 148.

Based on the facts as established before the hearing judge in this matter, Respondent engaged in activities similar to those in *Harris-Smith* and *Johnson*. She practiced law from a law office in Beltsville, Maryland. She failed at all times to disclose that she was unlicensed to practice law in Maryland, including on the firm's letterhead. She met with clients, signed retainer agreements, and explained the services offered by Glenmore. She requested documents from clients, and signed "Cease and Desist" letters sent to various banking institutions on behalf of Glenmore clients as "Tawana Shephard, Attorney at Law," again without disclosing her jurisdictional limitations. Based on these facts, we conclude that, in engaging in these activities, Respondent "was professionally required to review the facts and to decide the appropriate course of action" for the clients. *Harris-Smith*, 356 Md. at 84, 737 A.2d at 573. This, we have determined, constitutes the unauthorized practice of law. Moreover, we note that these activities rise above the level of "incidental contact" that Respondent suggests. Taken together, her actions and responsibilities constituted the unlicensed practice of law in the state of Maryland, in

violation of MLRPC 5.5.

As the objective of attorney disciplinary proceedings is the protection of the public, the public's perception is vitally important within this inquiry. *See Hallmon*, 343 Md. at 397, 681 A.2d at 514 ("The purpose of Rule 5.5 'is to protect the public from being preyed upon by those not competent to practice law—from incompetent, unethical, or irresponsible representation.'"); *Attorney Grievance Comm'n v. Harper & Kemp*, 356 Md. 53, 64, 737 A.2d 557, 563 (1999) (stating that where a lawyer "furnished his name to the enterprise[,] . . . [f]rom the standpoint of the public Kemp was Harper's partner."). In this case, from the standpoint of the public, it would be reasonable to believe that an individual introduced as the managing attorney of a firm with its main location in Maryland was authorized to practice law in Maryland, was responsible for the management of the attorneys at the law firm, and was the attorney who actually managed the law firm. Respondent could have (and indeed *should* have) informed the clients of her jurisdictional limitations, but she did not. *See Attorney Grievance Comm'n v. Maignan*, 423 Md. 191, 203, 31 A.3d 467, 474 (2011) (stating that an attorney's "failure to notify his client of [his] suspension [from the practice of law] serves as a ground for a violation of Rule 5.5(a)"); *Attorney Grievance Comm'n v. Awuah*, 374 Md. 505, 521, 823 A.2d 651, 661-62 (2003) (concluding that an attorney violated Rule 5.5 where, following his suspension from the practice of law in Maryland, his legal letterhead and business cards made "no mention of his privilege to practice having been suspended in Maryland nor that his practice was limited solely to immigration law").

## Rule 8.4(d) (Misconduct)

MLRPC 8.4(d) provides that "[i]t is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice." "An act prejudicial to the administration of justice is one that 'tends to bring the legal profession into disrepute.'" *Attorney Grievance Comm'n v. Goodman*, 426 Md. 115, 128, 43 A.3d 988, 995 (2012) (quoting *Attorney Grievance Comm'n v. Rose,* 391 Md. 101, 111, 892 A.2d 469, 475 (2006)). "We have long recognized that the commingling of personal and client funds is conduct which erodes public confidence in the legal profession, in violation of MRPC 8.4(d)." *Attorney Grievance Comm'n v. Carithers*, 421 Md. 28, 56, 25 A.3d 181, 198 (2011).

Here, the hearing judge concluded that Respondent violated MLRPC 8.4(d) based upon the mishandling of the trust account over which she exercised supervisory authority. Respondent excepts to this conclusion based on her exceptions to the other findings and conclusions related to the trust account. For the reasons we overruled Respondent's other exceptions, we shall overrule this exception as well. The facts of this case demonstrate that multiple client payments of unearned attorneys' fees were not deposited into the firm's attorney trust account. In addition, clients paid fees for work that was never performed without receiving refunds. Because Respondent was responsible for the firm's trust account and issuing refunds to clients, we conclude that under the circumstances, her failure to manage the trust account adversely affected the public's perception of the legal profession. *See Attorney Grievance Comm'n v. Mungin*, 439 Md. 290, 315, 96 A.3d 122,

136 (2014) (concluding that Mungin violated MLRPC 8.4(d) where he "was out of trust in each of the nine client matters, and failed to properly account for and disburse funds in a prompt fashion"). Accordingly, we conclude that Respondent violated MLRPC 8.4(d).

<u>Md. Rule 16-606.1 (Attorney Trust Account Record-Keeping)</u>

Maryland Rule 16-606.1 requires that trust account records "shall be created and maintained for the receipt and disbursement of funds of clients or of third persons." The hearing judge concluded that Respondent violated Rule 16-606.1 based on Respondent's admission that accounting errors had occurred.[18] In Judge White's (and Petitioner's) view, Respondent's acknowledgment of accounting errors would have precluded her from properly maintaining the records required by Md. Rule 16-606.1.

Respondent excepts to this conclusion, arguing that there was insufficient evidence to conclude that she did not keep the required records in violation of Rule 16-606.1. First, she argues that the evidence was insufficient because the account records themselves were not produced at the hearing. She states that she was unable to present the records because she had departed Glenmore before the firm's demise. Nevertheless, she testified at the hearing that the records were in fact kept. She further argues that the

---

[18] The hearing judge also concluded that Glenmore's trust account was not properly designated in breach of Maryland Rule 16-606. "Rule 16–606 is quite clear; it requires that all attorney trust accounts be designated in one of three manners[,]" namely, "Attorney Trust Account," "Attorney Escrow Account," or "Client Funds Account." *Attorney Grievance Comm'n v. Ross*, 428 Md. 50, 80-81, 50 A.3d 1166, 1183 (2012) (quoting *Attorney Grievance Comm'n v. Ellison*, 384 Md. 688, 708, 867 A.2d 259, 271 (2005)). Glenmore's account was simply labeled "Glenmore Law Firm, PLLC, IOLTA," which is impermissible under the Rule. *See id.* Petitioner, however, did not charge Respondent with violating Md. Rule 16-606.

39

"[m]ishandling of funds does not establish . . . that the records were not maintained." We agree that the mishandling of client funds does not, without more, prove that a lawyer with responsibility for the maintenance of an attorney trust account violated Md. Rule 16-606.1. Nonetheless, based upon our independent review of the record, we agree with the hearing judge's ultimate conclusion. Respondent testified that she was responsible for the maintenance of Glenmore's attorney trust account and that she gave instructions to Glenmore's accounting department, reviewed the account records, and made efforts to correct the records when she encountered errors. Multiple client payments did not have corresponding entries in the bank statements for the trust account produced at the hearing. With the exception of one payment, which an invoice demonstrated was placed in the law firm's operating account, Respondent was unable to explain or identify where those payments were deposited and/or recorded. *See Attorney Grievance Comm'n v. Harmon*, 433 Md. 612, 625, 72 A.3d 555, 563 (2013) (concluding that Harmon's inability to determine the correct source of client funds in his attorney trust account, as well as his failure to produce records to Bar Counsel, indicated that he failed to keep adequate records in violation of Maryland Rule 16-606.1); *Attorney Grievance Comm'n v. Van Nelson*, 425 Md. 344, 361, 40 A.3d 1039, 1048 (2012) (concluding that the respondent violated Maryland Rule 16-606.1 where he "did not maintain a record of the deposits of the retainer fees that he did not deposit into a trust account"). We are unpersuaded by Respondent's arguments and apparent excuses for failing to produce the records or satisfy her burden of proof. *See* Md. Rule 16-757(b) ("A respondent who asserts an affirmative

40

defense or a matter of mitigation or extenuation has the burden of proving the defense or matter by a preponderance of the evidence."). As the attorney in charge of the trust account, she had a duty to create, or cause to be created, and maintain adequate client ledgers. The evidence in the record demonstrates that she did not do so. We overrule Respondent's exception.

Rule 5.1 and BOP § 10-306

The hearing judge concluded that Respondent did not violate MLRPC 5.1 because she did not supervise lawyers and BOP § 10-306 because there was no evidence that she personally misused trust money. Neither party has taken exception to the hearing judge's conclusions with regard to these allegations. Based on the facts as presented above, we agree with the hearing judge's conclusion.

**SANCTION**

"It is well settled that our obligation in disciplinary matters is to protect the public and maintain the public's confidence in the legal system rather than to punish the attorney for misconduct." *Attorney Grievance Comm'n v. Nichols*, 405 Md. 207, 217, 950 A.2d 778, 785 (2008) (quoting *Attorney Grievance Comm'n v. Ward*, 394 Md. 1, 32-33, 904 A.2d 477, 496 (2006)). "Imposing a sanction protects the public interest because it demonstrates to members of the legal profession the type of conduct which will not be tolerated." *Attorney Grievance Comm'n v. Mooney*, 359 Md. 56, 96, 753 A.2d 17, 38 (2000) (citations and quotations omitted). The sanction imposed depends on the facts and circumstances of each case, and in arriving at an appropriate sanction, "we consider the

nature of the ethical duties violated in light of any aggravating or mitigating circumstances." *Attorney Grievance Comm'n v. Paul*, 423 Md. 268, 284, 31 A.3d 512, 522 (2011). Accordingly, the sanction should be "commensurate with the nature and gravity of the violations and the intent with which they were committed." *Attorney Grievance Comm'n v. Stein*, 373 Md. 531, 537, 819 A.2d 372, 375 (2003).

Although Respondent is not an attorney admitted to practice in Maryland, non-Maryland attorneys engaging in the unauthorized practice of law in Maryland can be sanctioned by this Court. *See* MLRPC 8.5(a)(2) ("A lawyer not admitted to practice in this State is also subject to the disciplinary authority of this State if the lawyer (i) provides or offers to provide any legal services in this State, [or] (ii) holds himself or herself out as practicing law in this State[.] . . ."). Based upon the list of violations in this case, Petitioner recommends that Respondent be disbarred. At oral argument before this Court, counsel for Respondent suggested that a reprimand or a definite suspension between 30 and 60 days would be more appropriate.

In unauthorized practice of law cases, "we primarily consider[] factors of deterrence, whether the respondent's conduct was wilful and deliberate, and whether the respondent cooperated with Bar Counsel's investigation." *Attorney Grievance Comm'n v. Shryock*, 408 Md. 105, 126, 968 A.2d 593, 605 (2009). In support of its recommended sanction of disbarment, Bar Counsel cites *Attorney Grievance Commission v. Alsafty*, 379 Md. 1, 838 A.2d 1213 (2003) and *Attorney Grievance Commission v. Barneys*, 370 Md. 566, 805 A.2d 1040 (2002), cases in which this Court applied those factors and disbarred

42

lawyers who had engaged in the unauthorized practice of law and other serious intentional misconduct.

In *Barneys*, the respondent, who was barred in several states and federal courts but not barred in Maryland, opened a law office and began representing clients in Maryland, to include entering his appearance in at least five cases in Maryland state courts. *Barneys*, 370 Md. at 571-72, 805 A.2d at 1043. In addition to finding that Barneys engaged in the unauthorized practice of law, the hearing judge in that case concluded that Barneys engaged in multiple instances of dishonest and deceitful conduct. *Barneys*, 370 Md. at 574, 805 A.2d at 1044. Similarly, *Alsafty* involved an attorney licensed to practice in New York and before some federal courts, who maintained a law practice in Baltimore, Maryland, consisting of domestic, civil, bankruptcy and immigration cases. *Alsafty*, 379 Md. at 6, 838 A.2d at 1216. From his office in Baltimore, Alsafty held himself out as a Maryland attorney and provided "no indication on [his] stationary or [his] business cards that [his] practice was limited to federal courts." *Id.* Indeed, the disciplinary proceedings arose out of a client complaint relating to a civil case filed in Maryland state court. *Alsafty*, 379 Md. at 8, 838 A.2d at 1217. In deciding that disbarment was the appropriate sanction in that case, we explained:

> A sanction of disbarment, using the logic of *Barneys,* would certainly serve the purpose of deterrence. Although there was a federal overlay in this case, the facts found indicate that it does not negate the respondent's wilful and intentional violation of the unauthorized practice rules. Indeed, the respondent was found to have begun his practice both in Maryland and in the federal court before he had been admitted by the federal court and that, even after admission to the federal court, he continued to practice in the

43

State court without license to do so and without apprising prospective clients that he was restricted to practicing only in federal court. For the same reasons just stated, the respondent is not assisted by the third factor. The fourth factor does not assist the respondent either. To the extent that he refrained from practicing in State court, he only did so after the fact of his unauthorized practice had come to light. But the respondent did not stop practicing right away. The hearing court determined that he continued to practice after February 13, 2002, when, according to his testimony, he knew he was not allowed to practice law in Maryland.

Nor is the respondent assisted by the distinction this Court has drawn between intentional dishonest conduct and negligently dishonest conduct. In this case, the respondent was found to have made misrepresentations, engaged in conduct characterized by dishonesty, fraud and deceit and even to have engaged in criminal conduct. Rather than characterize the respondent's conduct in a manner favorable to a mitigated sanction, the hearing court expressed itself strongly in stating its disbelief of the respondent's explanations and in characterizing them as non-forthcoming attempts to mislead.

*Alsafty*, 379 Md. at 19-20, 838 A.2d at 1224.

We note that both of these cases involved an unlicensed attorney's appearance in state court actions and intentional deceitful or dishonest conduct in violation of 8.4(b) and (c). *Alsafty*, 379 Md. at 10-14, 838 A.2d at 1218-21; *Barneys*, 370 Md. at 574, 805 A.2d at 1044. By contrast, in this case, Respondent did not appear in state court on behalf of any client, nor has Respondent been found to have violated MLRPC 8.4(b) or (c). In addition, though the facts of this case demonstrate neither a failure to cooperate with Bar Counsel nor wilful and deliberate dishonest or deceitful behavior, it is clear that Respondent wilfully and deliberately assumed responsibilities as a "Managing Attorney" in a law firm in Maryland, met with clients in Maryland, and undertook the representation of those clients in Maryland. In doing so, she misled clients and the general public by

44

failing to disclose the fact that she was not licensed to practice law in Maryland. Further, during Respondent's tenure as "Managing Attorney," several clients paid fees to Gilmore and did not receive the services that they were promised. As an attorney with 18 years of experience, albeit practicing in other states, we would expect Respondent to understand the nature of her actions and the responsibilities related thereto. Moreover, as Petitioner pointed out, Respondent applied for admission to the Maryland Bar at some point during her tenure with Glenmore, indicating her awareness that she required a license to practice law in this State.

At oral argument before this Court, counsel for Respondent urged us to rely on *Attorney Grievance Commission v. Barton*, 442 Md. 91, 110 A.3d 668 (2015), a case factually similar to this one. *Barton* involved a similar bevy of alleged violations, arising out of "a lack of competence and diligence" as well as "a pattern of client neglect and a failure to properly supervise nonlawyer employees." *Barton*, 442 Md. at 148, 110 A.3d at 701. In addition to Ms. Barton's failure to supervise her nonlawyer colleague, Ms. Barton was also responsible for assisting a nonlawyer in the unauthorized practice of law, in violation of 5.5(a). Noting the substantial mitigation in Ms. Barton's case–50 pro bono cases and a second job to try to make restitution to the victims of her nonlawyer assistant– we determined that a sanction of indefinite suspension was appropriate. *Barton*, 442 Md. at 147, 150, 110 A.3d at 701, 702.

In response, Petitioner argued that Respondent's misconduct is more egregious than that present in *Barton*, and therefore Respondent should receive a sanction more

severe than an indefinite suspension. Under the circumstances, we agree. Not only did the hearing judge make no findings as to mitigation, but, as Petitioner points out, Respondent engaged in a variety of misconduct. Respondent's misconduct stems from her ineffective supervision of the firm's attorney trust account and her engagement in the unauthorized practice of law in Maryland. Although Respondent maintains that her misconduct was unintentional, in some instances her misconduct led to harmful consequences to clients, and that harm was not remedied. By inadequately supervising the attorney trust account, Respondent harmed clients in failing to ensure that unearned attorneys' fees were being held in trust, and by failing to issue refunds when work was not performed. In addition, though Respondent signed retainer agreements promising services to clients and initial letters on behalf of clients in furtherance of those promised services, several clients' matters were either not completed or not undertaken at all.

Finally, one crucial feature of the instant case is Respondent's role as "Managing Attorney." When an attorney engages in managerial conduct like Respondent's, from which a reasonable client could conclude that the attorney is in some real way responsible for the client's matter and the legal matters of the firm generally, then that attorney has adopted a significant set of responsibilities. That Respondent took no reasonable steps to ensure that client matters were handled correctly is a serious violation. As noted, in cases involving the unauthorized practice of law, one of the factors we consider is deterrence. Here the misconduct evolved from an arrangement between an unlicensed attorney and a nonlawyer, whereby the unlicensed attorney agreed to manage a law firm for the

46

nonlawyer. Although the primary duties and responsibilities of the unlicensed lawyer related to the management of the law firm's attorney trust accounts, Respondent's ineffective management led to the firm's deposit of unearned client fees into the firm's operating account before performing any meaningful client services. Taking all of this into account, the appropriate sanction is disbarment.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO RULE 16-761, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST TAWANA D. SHEPHARD.**

Circuit Court for Baltimore City
Case No. 24-C-14-003643
Argued: May 6, 2015

IN THE COURT OF APPEALS
OF MARYLAND

AG No. 22

September Term, 2014

---

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

v.

TAWANA D. SHEPHARD

---

Barbera, C.J.
*Harrell
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.

---

Dissenting opinion by McDonald, J., as to
sanction

---

Filed: August 6, 2015

*Harrell, J., now retired, participated in the
hearing and conference of the case while an
active member of this Court; after being
recalled pursuant to the Constitution, Article IV,
Section 3A, he also participated in the decision
and adoption of this opinion.

I have no problem with the very fine opinion of the Majority which carefully reviews the record to determine the extent of Ms. Shephard's misconduct.  I disagree only as to sanction.  In my view, given the similarity of this case to our recent decision in *Attorney Grievance Comm'n v. Barton,* 442 Md. 91, 110 A.3d 668 (2015), a suspension would be more appropriate than disbarment.